[No. 28495. Department One. May 9, 1942.]

JESS PEASLEY, *Appellant,* v. PUGET SOUND TUG & BARGE COMPANY, *Respondent.*[1]

[1]Reported in 125 P. (2d) 681.

486

488

*Tyre H. Hollander,* for appellant.

*Bogle, Bogle & Gates* and *Stanley B. Long,* for respondent.

STEINERT, J.—Plaintiff brought suit to recover damages from defendant for malicious prosecution. Trial before a jury resulted in a verdict in plaintiff's favor, but the court thereafter granted defendant's motion for judgment notwithstanding the verdict and dismissed the action. Plaintiff has appealed.

On March 17, 1939, James Cary, an employee of respondent Puget Sound Tug & Barge Co., subscribed and swore to a complaint before a justice of the peace, charging that on the preceding day appellant, Jess Peasley, had committed the crime of interfering with, preventing, or obstructing the search for, and the retaking of, branded logs. Under Rem. Rev. Stat.,

§ 8381-11 [P. C. § 3690-11], the crime charged constitutes a gross misdemeanor, which by Rem. Rev. Stat., § 2267 [P. C. § 8702], is made punishable by imprisonment in the county jail for not more than one year, or by a fine of not more than one thousand dollars, or by both.

A warrant for Peasley's arrest was issued and he was taken into custody. He remained in jail for a period of twenty-four hours and then secured his release by posting the required bond. He was tried before the justice of the peace on March 30, 1939, and was acquitted of the criminal charge. On December 13, 1939, he instituted the present action, against respondent, for malicious prosecution, and at the trial thereof in the following year the jury returned a verdict in his favor in the sum of five hundred dollars. Respondent thereupon moved for a judgment notwithstanding the verdict, basing its motion upon seven distinct grounds, of which we note only the following: (1) That appellant had failed to sustain the burden of proving malice and want of probable cause on the part of respondent in preferring the criminal charge; (2) that respondent's employee, Cary, prosecuting witness in the criminal action, had made a full, fair, true, and complete disclosure to the prosecuting attorney for King county of all known facts and had been directed by that officer to sign the criminal complaint; (3) that it appeared from the evidence that appellant was guilty of the crime charged; (4) that the evidence established, further, that, at the time of committing the crime of which he was accused in the criminal complaint, appellant had also committed the crime of assault in the second degree; that full disclosure of the additional offense had likewise been made to the prosecuting attorney; but that the latter had elected only to charge appellant with the crime of interfering with the search

for, and the retaking of, branded logs; and (5) that the evidence conclusively established that there was probable cause for criminal proceedings against appellant upon the basis of either one, or both, of the offenses.

The trial court granted respondent's motion, but solely upon the ground that at the time of the alleged interference with the retaking of the logs in question, and as part of the same transaction, appellant had "committed an offense with a firearm or deadly weapon"; that the commission of that offense constituted probable cause for his arrest and prosecution, even though he was not charged with that particular crime; and that it therefore appeared, as a matter of law, that appellant was not entitled to recover upon his suit for malicious prosecution. It appears from the trial judge's memorandum opinion that he was of the view that appellant had violated Rem. Rev. Stat., § 2559, which makes it a misdemeanor to aim a gun, whether loaded or not, at or toward any human being. It is not clear whether the judge also believed that appellant had committed the crime of assault in the second degree, although both parties to this appeal seem to assume that he did so hold.

The case comes to us on a limited record only. The statement of facts is certified merely to contain all matters pertaining to the specific questions on which appellant bases his appeal; namely, whether or not he committed the crime of second degree assault at the time complained of in the criminal complaint, and whether or not, as a matter of law, he thereby became barred from recovery upon his action for malicious prosecution. The court's instructions to the jury are not before us, and we must therefore assume, for the purposes of this appeal, that they were adequate and correct.

The verdict of the jury established the fact that, under the instructions given by the court, there was a want of probable cause for charging appellant with the crime of interfering with the search for branded logs and the seizure thereof. We are not now asked to determine that, as a matter of law, there was probable cause for instituting prosecution for the particular crime charged, and we could not do so in any event, in the absence of a complete record.

█ The evidence as presented by the limited record and the inferences to be drawn therefrom are to some extent in dispute, but since this matter comes to us on an appeal from a judgment notwithstanding the verdict, we must view the evidence in the light most favorable to appellant. However, as will appear later, that requirement does not of itself alone determine or dispose of all the issues with which we are here concerned.

We shall first refer to appellant's testimony regarding the events leading up to the criminal charge. Peasley, a man past seventy years of age at the time of the trial of the present action in 1940, owned a mill site on Duwamish waterway in Seattle, together with the adjacent shorelands, and lived in the largest of three houses located on the property. In the spring of 1934, the Foss Tug Co., hereinafter referred to as the Foss company, allowed a raft of its logs to get out of control, and in consequence thereof Peasley's log-haul was torn down and his mill damaged. For the purpose of enabling Peasley to repair the damage, the Foss company delivered to him eight of its own boom sticks. Peasley was to furnish the labor required in the work of repair, and any logs left over were to be picked up later by the Foss company, Peasley being instructed at the time, however, not to let anyone take them away. Owing to the fact that Peasley was in poor health, and

to the further fact that he ran short of money, due to the closing of the bank where he kept his funds, the repair work was not performed, and so the logs lay anchored in the water on his premises until, and after, the time of the events about to be narrated.

Shortly after New Year's day, 1938, Cary, the employee of respondent, appeared upon Peasley's premises and inspected the logs. Peasley did not know Cary at that time nor did he learn his identity until March, 1939, when Cary appeared as prosecuting witness against Peasley in the criminal action out of which this suit has arisen. On the day of his visit, Cary offered to buy the logs, but Peasley told him that he could not sell them. Later that spring, Cary drove into Peasley's yard and then went upon the raft of logs. At the same time, two other men came along in a gas boat from which they launched a row boat, and proceeded to the logs with pike poles. As Peasley emerged from his house, Cary indicated that they were going to take some of the boom sticks belonging to the Foss company and began to point out to the other men several of the logs. On seeing Peasley, Cary asked him whether he had a telephone. Peasley told him he did not have a phone, but directed him to a place where he might find one. Cary then left, apparently for the purpose of telephoning, but did not return. After waiting a while, the other two men also departed, in their boat.

Late that fall, Cary came back to Peasley's place and said he had come to get two of the boom sticks. Peasley reiterated that the logs belonged to the Foss company and were not for sale, and directed Cary to a nearby timber company where he might buy any kind of boom sticks he wanted. Cary then went away, but on March 16, 1939, at about ten a. m., he again returned and parked his car alongside Peasley's house. At the same time, two other men came up with a tugboat and

the three men began to take the boom sticks out.
Peasley was sick in bed at the time, but a neighbor,
Richard Jacobson, observing what was taking place,
came to Peasley's house, aroused him, and told him
that somebody was taking the logs. Peasley then went
outside and, according to his testimony, the following
colloquy took place:

"I came out there and here is this same man, and I
said, 'What are you doing here?' And he said, 'I am
taking these logs out of here.' And I said, 'Have you
got an order from the Foss Company?' And he said
'I don't need it,' and I said 'Certainly you have to have
an order from the Foss Company; you will get me in
bad. I don't want to pay for these old boom sticks lay-
ing here.' [He said] 'Well, that is your business, and
not mine,' and I said, 'Who are you anyway?' And he
said 'None of your business,' and I said 'You get out of
here or I will get a shotgun and you will get out of
here,' and of course he went, he got in the car and
drove away."

Immediately upon telling Cary to get off his prem-
ises, appellant went hurriedly into his house and pro-
cured a shotgun. Upon his return some three or four
minutes later, Cary had disappeared, but the other
two men were still on or near the logs. We quote again
from Peasley's testimony:

"A. When I came out with the shotgun—you are
right—I said, 'Boys, leave them logs alone.' and they
said 'We have got nothing to do with it ourselves; we
are working for this guy,' and I said 'Who was this
guy?' Q. Did you know his name? A. No, sir.
Q. Or who he was? A. No, sir. Q. Or where he
was from? A. Nothing, not a thing in the world.
Q. Did he ever tell you his name? A. He never told
me. I asked him and he told me it was none of my bus-
iness. Q. And you said you would get the shotgun?
A. Yes, sir. Q. And what was his reply? A. Why,
when I asked him 'Who are you?' he said 'None of your
business.' A. The shotgun you brought out, what
kind of a shotgun was it? Q. It is a pump gun, 16-

gauge. Q. Did you have any shells in it? A. It didn't have any shells in it. Q. Did you point it at anybody? A. No, I never did. Q. Where did you put it? A. I had it in my hand. What would I want to point a gun at somebody for? There was nobody there. Q. One of the witnesses said you worked the rachet as though you were pumping shells? A. The gun was empty. I was playing with it. MR. LONG: The question was did you work the rachet? A. Yes, sir; on the handle underneath. Q. (Mr. Hollander) Where you pump the shells in the chamber? A. Yes, sir. It was empty. It couldn't hurt nobody. Q. When you came out with the gun was Mr. Carey there? A. No; he wasn't there."

On cross-examination, Peasley testified:

"Q. You told him [Cary] you would get a gun and put it on him if he didn't get out? A. I told him that, sure. Q. Did you get the gun? A. Yes, sir."

Peasley admitted on cross-examination that he had been convicted once of grand larceny, and that he had been in jail at least three times for violations of the liquor laws.

The witness Richard Jacobson largely corroborated appellant with respect to what took place on March 16th between appellant and Cary, and also testified that the gun was not loaded. He further testified, however, on direct examination, as follows:

"Q. When Mr. Peasley came out with the shotgun did he talk with any of the men on the logs? A. Yes, sir. Two men was on the logs, and one of them had a pike pole, and Mr. Peasley said 'Get off those logs,' and they said they were going, and they got on their towboat and left. Q. Do you recall whether or not Mr. Peasley asked who they were? A. I don't recall that. Q. Do you recall whether or not he asked Mr. Carey who they were? A. No. Q. Did you have occasion to examine the gun? A. The only time when Mr. Peasley cocked the gun I saw there were no shells in it. Q. There were no shells in the gun? A. That's right. Q. Did he ever point it [the gun] at these men?

A. He had it in the crook of his arm, and he pumped it—it is a pump shotgun—and as he did that I looked in the chamber. Q. There were no shells in the chamber? A. That's right. . . . Q. Did Mr. Peasley say anything to Mr. Carey about getting an order from anybody for the logs? A. No; he asked what they were doing there, and Mr. Carey said he was getting the logs. He didn't ask him about an order."

On cross-examination Jacobson testified:

"Q. Mr. Peasley said he would get his gun and went in the house, did he? A. Yes, sir. Q. He hurried right in the house to get it? A. Yes, sir. Q. And he was apparently pretty mad about that time? A. Yes, sir, he was. Q. And did you tell Mr. Carey he had better get out of there or he might shoot him? A. I probably did. Q. And Mr. Carey got out of there with both feet? A. Yes, sir. . . . Q. And from the position of these two men on the raft they couldn't see in the chamber? A. No, sir. Q. So as far as they knew he might have had any number of shells in it? A. Yes, sir. Q. He carried it in the crook of his arm? A. Yes, sir. Q. And pointed it in their direction? A. Yes, sir. Q. And did they seem to be frightened? A. They were. Q. And they got out of there with all speed? A. That's right. . . . Q. But you told Mr. Carey he had better get out; that he might get shot? A. Yes, sir. You can't tell what a man might do with a gun. Q. And he was pretty mad, wasn't he? A. Sure."

Respondent called as witnesses the two men who had accompanied Cary and who were in the tugboat. They testified that appellant used profanity during the altercation, and that, while holding the gun in the crook of his arm, though not raising it to his shoulder, he ordered them to get out. One of the witnesses testified that the gun was pointed in the general direction of the other witness stationed some little distance away from the former, and the second witness testified that it was pointed at him in such a way that he looked right down the barrel.

On the following day, Mr. Cary, accompanied by a deputy sheriff who was also a log patrolman, called at the office of the King county prosecuting attorney where they related the foregoing events, first to one of the junior deputies in the office, and then to the chief criminal deputy. They talked to the former for about an hour, and to the latter for fifteen or twenty minutes. It appears from the record that the prosecuting officers were interested mainly in the question of ownership of the logs, as bearing upon Cary's right to take them; but they were also informed of Peasley's use of the shotgun in preventing the taking of the logs. The limited record before us does not include the evidence with respect to the actual title to the logs, nor does it in its incomplete form enable us to say, as a matter of law, that Cary made a full and honest disclosure of all the facts pertaining to his right, as an employee of respondent, to take the logs on the day in question. Upon those matters, therefore, we must accept the verdict of the jury as a conclusive determination in favor of the appellant.

We now give our attention to the legal phases of the action for malicious prosecution brought by appellant against the respondent. This court, in common with most other courts, has frequently said that actions for damages for malicious prosecution are not favored in law, although they will be readily upheld when the proper elements therefor have been presented. *Simmons v. Gardner*, 46 Wash. 282, 89 Pac. 887, L. R. A. 1915D, 16; *Anderson v. Seattle Lighting Co.*, 71 Wash. 155, 127 Pac. 1108; *Terusaki v. Matsumi*, 106 Wash. 538, 180 Pac. 468; *Hall v. Dare*, 147 Wash. 264, 266 Pac. 162. See, also, Newell, Malicious Prosecution (1892) 21, 22; 34 Am. Jur. 705, Malicious Prosecution, § 5; 38 C. J. 385, Malicious Prosecution, § 2. The reasons assigned for this attitude on the part of the courts are

that it is to the best interest of society that those who offend against the law shall be promptly punished; that any citizen who has good reason to believe that the law has been violated shall have the right to take proper steps to cause the arrest of the offender; and that in taking such steps the citizen who acts in good faith shall not be subjected to damages merely because the accused is not convicted; yet, withal, that no man shall be charged with a crime, exposed to the danger of a conviction, and subjected to the expense, vexation, and ignominy of a public trial merely for the gratification of another's malice or ill will.

To maintain an action for malicious prosecution, the plaintiff must allege and prove (1) that the prosecution claimed to have been malicious was instituted or continued by the defendant; (2) that there was want of probable cause for the institution or continuation of the prosecution; (3) that the proceedings were instituted or continued through malice; (4) that the proceedings terminated on the merits in favor of the plaintiff, or were abandoned; and (5) that the plaintiff suffered injury or damage as a result of the prosecution. *Terusaki v. Matsumi, supra; Ton v. Stetson,* 43 Wash. 471, 86 Pac. 668; 34 Am. Jur. 706, Malicious Prosecution, § 6; 38 C. J. 386, Malicious Prosecution, § 5; 3 Restatement, Torts (1938) § 653. Of these five elements, malice and want of probable cause constitute the gist of such an action. *Noblett v. Bartsch,* 31 Wash. 24, 71 Pac. 551, 96 Am. St. 886; *Ton v. Stetson, supra; Waring v. Hudspeth,* 75 Wash. 534, 135 Pac. 222; *Pallett v. Thompkins,* 10 Wn. (2d) 697, 118 P. (2d) 190; *Brooks v. Bolde,* 11 Wn. (2d) 37, 118 P. (2d) 193; Newell, Malicious Prosecution (1892) 7; 34 Am. Jur. 703, 728, 730, Malicious Prosecution, §§ 2, 44, 46; 38 C. J. 398, 420, Malicious Prosecution, §§ 26, 59.

■ The burden of proof on both of these basic elements, as well as on the other requisites for an action for malicious prosecution, rests upon the plaintiff. *Simmons v. Gardner, supra; Anderson v. Seattle Lighting Co., supra.* Accord, *Terusaki v. Matsumi, supra.* See, also, 34 Am. Jur. 775, 776, Malicious Prosecution, §§ 123, 124; 38 C. J. 475-479, Malicious Prosecution, §§ 146-152. Moreover, the burden of proving want of probable cause never shifts to the defendant, but remains upon the plaintiff throughout the trial in the suit for malicious prosecution. *Noblett v. Bartsch, supra; Charlton v. Markland,* 36 Wash. 40, 78 Pac. 132; *Waring v. Hudspeth, supra; Huf v. Hague,* 171 Wash. 302, 17 P. (2d) 844; *Brooks v. Bolde, supra.* Likewise, the burden of proof on the question of malice is not shifted to the defendant by proof of want of probable cause. *Saunders v. First Nat. Bank of Kelso,* 85 Wash. 125, 147 Pac. 894. In some cases, however, where the evidence is sufficient to establish want of probable cause, malice may be inferred from that fact when proven; but this is not a necessary deduction which must invariably be made. *Ton v. Stetson, supra; Anderson v. Seattle Lighting Co., supra; Waring v. Hudspeth, supra; Ladd v. Miles,* 171 Wash. 44, 17 P. (2d) 875; *Pallett v. Thompkins, supra;* Newell, Malicious Prosecution (1892) 247; 38 C. J. 425, Malicious Prosecution, § 68.

■ A *prima facie* case of want of probable cause is established by proof that the criminal proceedings were dismissed or terminated in favor of the party bringing the malicious prosecution action. *Noblett v. Bartsch, supra; Charlton v. Markland, supra; Waring v. Hudspeth, supra; Saunders v. First Nat. Bank of Kelso, supra; Hightower v. Union Savings & Trust Co.,* 88 Wash. 179, 152 Pac. 1015, Ann. Cas. 1918A, 489; *Pallett v. Thompkins, supra; Brooks v. Bolde, supra.*

This rule, though firmly established in this state, appears to be contrary to the weight of general authority. See 34 Am. Jur. 740, 742, Malicious Prosecution, §§ 58, 62, and cases there cited; 38 C. J. 413, 416, Malicious Prosecution, §§ 48, 53; 3 Restatement, Torts (1938) §§ 665, 667; and the following annotations: (1923) 24 A. L. R. 262, 280; (1925) 94 A. L. R. 745, 749; (1938) 114 A. L. R. 886, 887; (1904) 64 L. R. A. 475; (1908) 12 L. R. A. (N. S.) 717; L. R. A. 1918D, 1137; (1907) 7 Ann. Cas. 859; (1911) 18 Ann. Cas. 65; Ann. Cas. 1916E, 376; (1892) 26 Am. St. 155; (1892) 27 Am. St. 337; and (1893) 30 Am. St. 758.

A *prima facie* case thus made by the plaintiff, however, may be rebutted, as in other cases, by the defendant's evidence. *Brooks v. Bolde, supra.* If it is so rebutted, then the plaintiff must *by evidence* affirmatively establish want of probable cause.

If the defendant meets and overcomes a *prima facie* case of want of probable cause, then the issue of malice becomes immaterial, since proof of probable cause is a complete defense to an action for malicious prosecution. *Hightower v. Union Savings & Trust Co., supra; Bartolomeo v. Richards,* 154 Wash. 642, 282 Pac. 925; *Christiansen v. Anderson,* 179 Wash. 368, 37 P. (2d) 889; *Brooks v. Bolde, supra.* On the other hand, however, if the plaintiff successfully establishes want of probable cause for defendant's institution of criminal proceedings against him, that in itself will not justify his recovery of damages for malicious prosecution. He must go further and establish malice on the part of the defendant, for want of probable cause without malice is of no avail. *Ton v. Stetson, supra; Simmons v. Gardner, supra.*

If it clearly appears that the defendant, before instituting criminal proceedings against the plaintiff, made to the prosecuting attorney a full and fair

disclosure, in good faith, of all the material facts known to him, and that the prosecuting attorney thereupon preferred a criminal charge and caused the arrest of the accused, probable cause is thereby established as a matter of law and operates as a complete defense to a subsequent action by the accused. And the same rule prevails where such disclosure was made to a competent practicing attorney, and the criminal prosecution was instituted upon his advice. *Simmons v. Gardner, supra; Anderson v. Seattle Lighting Co., supra; Hightower v. Union Savings & Trust Co., supra; Main v. Healy,* 100 Wash. 253, 170 Pac. 570; *Borg v. Bringhurst,* 105 Wash. 521, 178 Pac. 450; *Bruce v. Elmergreen,* 106 Wash. 359, 180 Pac. 135; *Lester v. Millman,* 107 Wash. 300, 181 Pac. 878; *Puffe v. Frink,* 155 Wash. 578, 285 Pac. 430; *Carr v. Zellerbach Paper Co.,* 169 Wash. 493, 14 P. (2d) 35; *Huf v. Hague, supra; Christiansen v. Anderson, supra; Brooks v. Bolde, supra;* Newell, Malicious Prosecution (1892) 310, 317; 34 Am. Jur. 747, 748, Malicious Prosecution, §§ 71, 72; 38 C. J. 427, 430, 431, Malicious Prosecution, §§ 72, 75, 76. Accord, *Eberhart v. Murphy,* 113 Wash. 449, 194 Pac. 415.

 A corollary to this rule is that if any issue of fact exists, under all the evidence, as to whether or not the prosecuting witness did fully and truthfully communicate to the prosecuting attorney, or to his own legal counsel, all the facts and circumstances within his knowledge, then such issue of fact must be submitted to the jury with proper instructions from the court as to what will constitute probable cause, and the existence or nonexistence of probable cause must then be determined by the jury. *Simmons v. Gardner, supra; Finigan v. Sullivan,* 65 Wash. 625, 118 Pac. 888; *Baer v. Chambers,* 67 Wash. 357, 121

Pac. 843, Ann. Cas. 1913D, 559; *Lester v. Millman,* *supra.*

Reverting to the five elements necessary to the maintenance of an action for malicious prosecution, we deem it clear, and respondent does not dispute the fact, that appellant established three of those elements: (1) that the prosecution on the criminal complaint was instituted and maintained by respondent; (2) that the proceeding terminated in favor of appellant; and (3) that appellant suffered injury or damage, to some extent at least, from the criminal prosecution. This leaves for consideration the two elements (a) want of probable cause for the institution of the criminal proceedings, and (b) institution of such proceedings through malice.

▌ The burden of proving both of those elements rested, of course, upon the appellant and continued to do so throughout the trial of the action for malicious prosecution, and at no time did it shift to respondent. However, under the rules and authorities above cited, appellant made out a *prima facie* case of want of probable cause by showing that he had been acquitted of the charge specified in the criminal complaint, namely, interfering with the search for, and seizure of, branded logs. We may readily assume that respondent, in an endeavor to overcome appellant's *prima facie* case, introduced evidence of its right to take the logs on the occasion in question. That evidence, however, if any was so introduced, has not been brought to this court by the record now presented. In any event, the jury weighed the evidence and, after considering the instructions given by the trial court, returned a verdict in favor of appellant. The issue of respondent's right to take the logs was thus, by the verdict, resolved against respondent, and there is nothing in the record which would warrant us in holding that the

502

verdict was contrary to the evidence upon the issue of want of probable cause.

Although the existence of malice was not a necessary deduction from the mere finding of want of probable cause, it was, in our opinion, an inference which the jury was entitled to draw from the facts which it necessarily found by its verdict. Malice as a term of law has a broader significance than that which is applied to it in ordinary parlance. The word "malice" may simply denote ill will, spite, personal hatred, or vindictive motives according to the popular conception, but in its legal significance it includes something more. It takes on a more general meaning, so that the requirement that malice be shown as part of the plaintiff's case in an action for malicious prosecution may be satisfied by proving that the prosecution complained of was undertaken from improper or wrongful motives or in reckless disregard of the rights of the plaintiff. Impropriety of motive may be established in cases of this sort by proof that the defendant instituted the criminal proceedings against the plaintiff: (1) without believing him to be guilty, or (2) primarily because of hostility or ill will toward him, or (3) for the purpose of obtaining a private advantage as against him. Newell, Malicious Prosecution (1892), 237, § 3; 34 Am. Jur. 728, Malicious Prosecution, § 45; 38 C. J. 421-425, Malicious Prosecution, §§ 60-67; 3 Restatement, Torts (1938), § 668. We have recognized and applied this broader conception of the term in *Waring v. Hudspeth, supra.* Compare *Ladd v. Miles, supra.*

The jury may well have found, in this case, not only that Cary, as respondent's agent, had no right to remove the logs, but also that he was endeavoring to do so surreptitiously, or at least without producing the requested authority for his act, and over the justi-

fiable protest of appellant. The jury may also have found that Cary's reason for swearing out a criminal complaint was merely because he had been surprised and thwarted in his attempt to accomplish an unlawful objective, and that he was prompted by a feeling of "bitterness, animosity or vindictiveness towards the appellant" (the expression used in *Ton v. Stetson, supra*), or at least by an improper or wrongful motive. Under the circumstances shown by the evidence contained in the record now before us, the question of malice was clearly for the jury.

Thus far, our discussion has related chiefly to the charge upon which appellant was prosecuted and to his right to maintain an action for malicious prosecution based thereon. We now come to the more difficult problems presented by this case. The trial court held, and the respondent contends upon this appeal, that in any event the appellant cannot recover upon his action for malicious prosecution, because at the time of his final encounter with Cary he committed another crime than that with which he was thereafter charged. As has already been suggested, we are in some doubt as to whether the trial court held that appellant had committed the crime of assault in the second degree, or only that he had violated the statutory prohibition against aiming a gun at another person. However, both parties to this appeal not only have assumed that the trial court, as a matter of law, found appellant guilty of assault in the second degree, but they have devoted nearly the whole of their briefs to the discussion of two propositions, each of which is affirmed by respondent and controverted by appellant, namely: (1) that the acts of appellant in resorting to the use of a firearm constituted, as a matter of law, the crime of assault in the second degree, and (2) that proof of the commission of that offense, although appellant was

not charged therewith nor prosecuted therefor, nevertheless constituted a bar to the maintenance by him of an action for malicious prosecution and therefore entitled respondent to a judgment notwithstanding the verdict.

Rem. Rev. Stat., § 2414 [P. C. § 8759], provides:

"Every person who, under circumstances not amounting to assault in the first degree [Rem. Rev. Stat., § 2413, defining assault in the first degree, has reference to acts done with intent to kill a human being or to commit a felony upon the person or property of the one assaulted.]—

"(4) Shall willfully assault another with a weapon or other instrument or thing likely to produce bodily harm; . . .

"Shall be guilty of assault in the second degree and be punished by imprisonment in the state penitentiary for not more than ten years or by a fine of not more than one thousand dollars, or by both."

Rem. Rev. Stat., § 2416 [P. C. § 8761], in so far as it is material here, provides:

"The use, attempt, or offer to use force upon or toward the person of another shall not be unlawful in the following cases: . . .

"(3) Whenever used by a party *about to be injured,* or by another lawfully aiding him, in preventing or attempting to prevent an offense against his person, or a malicious trespass, or other malicious interference with real or personal property lawfully in his possession, in case the force is not more than shall be necessary." (Italics ours.)

 In denoting and distinguishing the various acts and elements which constitute the several degrees of assault, the statutes make an indiscriminate use of the very word "assault," but nowhere in our present criminal code is that word itself defined. Hence, as stated in *Howell v. Winters,* 58 Wash. 436, 108 Pac. 1077, resort must be had to the common law for a definition.

That case adopts the definition given by Judge Cooley, as follows:

" 'An assault is an attempt, with unlawful force, to inflict bodily injury upon another, accompanied with the apparent present ability to give effect to the attempt if not prevented. Such would be the raising of the hand in anger, with an apparent purpose to strike, and sufficiently near to enable the purpose to be carried into effect; the pointing of a loaded pistol at one who is within its range; the pointing of a pistol not loaded at one who is not aware of that fact and making an apparent attempt to shoot; shaking a whip or the fist in a man's face in anger; riding or running after him in [a] threatening and hostile manner with a club or other weapon; and the like.' Cooley, Torts (3d ed.), p. 278."

Other definitions of similar import may be found in 2 Bishop, Criminal Law (9th ed., 1923), 16, § 23; 1 Wharton, Criminal Law (12th ed., 1932), 1094, § 799; Ballentine, Law Dictionary (1930) 111; 1 Bouvier, Law Dictionary (Rawle's Third Revision, 1914) 253; 4 Am. Jur. 124, Assault and Battery, § 2; 6 C. J. S. 796, Assault and Battery, § 1.

Whether there has been an assault in a particular case depends more upon the apprehension created in the mind of the person assaulted than upon the undisclosed intention of the person committing the assault. *Howell v. Winters, supra; Allen v. Hannaford,* 138 Wash. 423, 244 Pac. 700. Hence, the fact that the pistol or gun used is not loaded at the time is immaterial if the person at whom the weapon is pointed does not know that it is not loaded.

Another factor which must be taken into consideration in determining whether or not a particular act amounts to an assault, for which the actor may be held criminally liable, is the element of justifiable cause, for if the evidence shows that the act com-

mitted was justifiable, or leaves that question in doubt, then the criminal act is not proved.

One of the defenses to a charge of assault is that the act was committed in the defense of property of the actor, or of one whom he is under a legal duty to protect. It is the generally accepted rule that a person owning, or lawfully in possession of, property may use such force as is reasonably necessary under the circumstances in order to protect that property, and for the exertion of such force he is not liable either criminally or civilly. 4 Am. Jur. 159, 164, Assault and Battery, §§ 61, 68; 6 C. J. S. 816, 821, 951, Assault and Battery, §§ 20, 94. It is also the general rule, however, that the use of a deadly weapon in the protection of property is unjustifiable, except in extreme cases. 4 Am. Jur. 163, Assault and Battery, § 64; 6 C. J. S. 817, 951, Assault and Battery, §§ 20, 94. But see 1 Bishop, Criminal Law (9th ed., 1923), 622, § 875, and 1 Wharton, Criminal Law (12th ed., 1932), 866, § 633, and cases cited in both treatises.

Whether the force used in the defense of property is greater than is justified by the existing circumstances is ordinarily a question of fact for the jury to determine under proper instructions by the court. 4 Am. Jur. 163, Assault and Battery, § 65; 6 C. J. S. 998, Assault and Battery, § 127.

Rem. Rev. Stat., § 2416, quoted above, recites various sets of circumstances under which the use of force, or the attempt or offer to use it, *shall not be unlawful*. The particular provision of that section here applicable is to the effect that manifestations of force are not unlawful when exercised by one *about to be injured* while engaged in preventing or attempting to prevent a malicious trespass or other malicious interference with real or personal property lawfully

in his possession, provided the force is not more than shall be necessary. This statute is somewhat ambiguous in two respects: First, while it specifies certain circumstances under which the use of force shall not be unlawful, it does not affirmatively state that the use of, or attempt or offer to use, force shall be unlawful in all other circumstances. It is only by inference that we can adopt this tentative corollary. Second, the phrase "about to be injured" may be construed as referring either to injury in the general sense or merely to injury to one's person. If the former construction be adopted, then force may be used to the extent necessary to prevent a malicious interference with real or personal property lawfully in the possession of the person using the force; while if the second construction is the proper one, then it would seem that force may never be used in the protection of property. Appellant contends for the first construction and respondent for the second. The trial court expressly sustained respondent's contention upon this point.

There are no decisions in this state that are of any aid to us in the solution of respondent's first proposition stated above (that the acts of appellant in resorting to the use of a firearm constituted, as a matter of law, the crime of assault in the second degree) and the decisions from other jurisdictions bearing thereon tend to produce confusion rather than to afford a ready solution. We are of the opinion that because of this situation the questions involved in respondent's first proposition should, for the purpose of determining the law thereon in this state, be decided in a case where a party is directly charged with the crime of assault, and the question of his guilt expressly determined in such action, instead of being decided in a case, such as this, where the issue is, in a sense, col-

lateral and affects only a civil liability. We are the more constrained to adopt this view for the reason that the second of the two propositions raised on this appeal (hereinafter stated as the final question to be considered) must, in any event, be here decided and is, because of our conclusion thereon, entirely determinative of the case. For the purposes of this appeal, therefore, and as an approach to the second of the two propositions here disputed, we shall assume, without so deciding, that appellant's conduct in resorting to the use of a firearm, even though it was unloaded, constituted as a matter of law the crime of assault in the second degree.

The final question then is: If, upon the occasion here involved, appellant committed an offense other than that with which he was charged in the criminal complaint sworn to by Cary, was respondent entitled to a judgment notwithstanding the verdict in this action for malicious prosecution? To answer that question in the affirmative would require us to say that the commission of such other offense afforded legal and sufficient ground for the criminal prosecution actually instituted; or, to state the matter more directly with reference to the present action by appellant, it would necessitate a ruling that the want of probable cause established by appellant may be overcome by proof of another offense.

The term "probable cause," as used in connection with an action for malicious prosecution, means reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant an ordinarily prudent and cautious man in believing the accused guilty of the offense *with which he is charged.* *White v. Jansen,* 81 Wash. 435, 142 Pac. 1140. Accord, *Waring v. Hudspeth, supra; Ladd v. Miles, supra.* See,

also, 34 Am. Jur. 731, Malicious Prosecution, § 47; 38 C. J. 403, Malicious Prosecution, § 31; and 34 Words and Phrases (Perm. ed. 1940) 46 *et seq.,* for extensive lists of cases so defining the term.

It would have been competent for respondent to show, in this case, that appellant was actually guilty of the crime charged in the criminal complaint, by proving a conviction upon that charge (*McKenzie v. Royal Dairy,* 35 Wash. 390, 77 Pac. 680; *MacEachern v. MacEachern,* 126 Wash. 32, 216 Pac. 881; 34 Am. Jur. 737, Malicious Prosecution, § 54) or, even despite his acquittal on that charge, by competent evidence establishing actual guilt (34 Am. Jur. 788, Malicious Prosecution, § 147; 38 C. J. 459, Malicious Prosecution, § 121. See, also, note (1940) 125 A. L. R. 897). Actual guilt of the crime charged was not established, however, for appellant was acquitted in the criminal prosecution, and the verdict of the jury in this action for malicious prosecution negatives any showing of actual guilt.

Respondent could likewise have established probable cause for the criminal action against appellant by showing that its agent, Cary, had fully, fairly, and in good faith disclosed to the prosecuting attorney all the material facts then within his knowledge. But, as already stated in a preceding portion of this opinion, the record does not show that he made such a disclosure, and the verdict of the jury, rendered upon instructions given by the court, conclusively establishes that he did not do so.

We see no good reason for further extending the rule of immunity by holding that mere proof of another crime, upon which there has been neither criminal charge nor prosecution, should nevertheless constitute a complete defense to an action for mali-

cious prosecution based upon a different charge. It may well be that where an informant makes full and true disclosure of *all* the material facts, from which it appears that two distinct offenses have been committed, and the prosecuting attorney elects to institute prosecution for but one of them, the informant should be protected against a suit for malicious prosecution, even though the accused should be acquitted of the crime actually charged. The prosecuting witness should be protected in such cases because he has made full and true disclosure of all the facts and because the prosecuting attorney has assumed responsibility for filing the charge and has control over the actual institution of criminal proceedings. But where there has been a lack of proper disclosure, the responsibility for the prosecution does not shift from the informant to the prosecuting attorney. Had that official been fully informed, in this case; as to the title to the boom sticks here in question, or as to the fact that there was a dispute concerning title thereto, it is doubtful that he would have filed the particular charge upon which appellant was tried and acquitted, and it is quite likely that he would have remitted respondent to its civil remedies instead. And had the prosecuting attorney declined to charge appellant with interfering with the retaking of branded logs, he might have made a fuller investigation before filing a charge of assault in the second degree, which, it may be noted, is a more serious offense, so far as the penalty is concerned, than the offense with which appellant was actually charged. These inferences find support in the record herein, for it is clear that the consultation with the deputy prosecuting attorneys had reference principally to a violation of the statute respecting searches for, and retaking of, branded logs, and that

the matter of the use of the shotgun was regarded merely as the means by which appellant prevented Cary from retaking the boom sticks here in question. Moreover, the chief criminal deputy testified that criminal complaints are not issued by the prosecuting attorney's office for the mere asking, but only after it has been made reasonably clear that a criminal statute has been violated. He also testified that criminal complaints are issued in not more than one-fourth of the cases in which they are requested, and that, where it appears that nothing more than a civil dispute is involved, the parties are left to their civil remedies. And this, we think, is the proper practice to be followed.

Strangely enough, there is no legal precedent to serve as a guide for the decision of the particular question here under consideration. There are innumerable cases involving malicious prosecution, but none presenting a situation similar to that now before us. The question is certainly one of first impression in this jurisdiction, and neither the industry of counsel nor our own independent research has led to a discovery of any decision which, in our opinion, touches upon this exact question. Only one case has been cited to us which bears even a remote similarity to this one, and that case is distinguishable upon its facts. In *Nettleton v. Cook*, 30 Idaho 82, 163 Pac. 300, L. R. A. 1917D, 1194, the plaintiff had been charged by the county attorney, at the instance of defendant's intestate, with disturbing a headgate used by an irrigation company for the measurement of water, in violation of Idaho Revised Codes (1908) § 7146. After hearing the testimony offered by the state, the committing magistrate discharged the accused, who thereupon instituted suit for malicious prosecution. It appeared

by plaintiff's own admission that he had broken a padlock by which the headgate was locked and had then opened the headgate and allowed the water to run through. Strictly speaking, he should have been charged under § 7145 of the Revised Codes which, though couched in language very similar to that of § 7146, is different in some respects, with different intendments in view. It probably would require some one versed in the laws of Idaho to tell the exact difference between the two companion sections of the statute. The supreme court of Idaho held, on appeal from a judgment awarding the plaintiff damages for malicious prosecution, that the act of the plaintiff in breaking the padlock was clearly a violation of § 7145, rather than of § 7146 under which he had been charged, but that the mere fact that the county attorney had prosecuted the plaintiff under a statute which failed technically to describe and identify the offense which the latter had perpetrated did not rebut the fact that a crime had been committed, which, since the plaintiff had admitted his guilt, in itself constituted probable cause for the criminal prosecution undertaken against him.

We think the decision in that case was clearly correct, as applied to the facts there involved, although in some respects the language employed seems too general. The criminal prosecution for which the plaintiff therein sought damages was based upon acts which he did commit and of which he was in fact guilty by his own admission. The fact that he was charged under one statute when he should have been charged under another, similar in context and relating to the same general subject matter, was at most a technical mistake, and did not alter the fact that he was guilty of the crime concerning which complaint had been

made by the prosecuting witness. That was not the situation here. The two crimes here involved came within two entirely different sections of the criminal code, and guilt under one of them had no necessary relation to guilt under the other. Furthermore, we are of the opinion that the appellant was prosecuted for interfering with the retaking of branded logs rather than for committing a second degree assault, not because of any error or omission on the part of the prosecuting officials, but solely because Cary and the log patrolman who accompanied him to the prosecuting attorney's office sought prosecution on that particular ground. The deputy prosecuting attorney to whom they first talked had never, prior to their visit, heard of the statute which appellant was charged with violating. That fact affords a strong inference that Cary was the one actually responsible for the form of the charge finally filed. Upon the record presented here, we conclude that respondent was not entitled to a judgment notwithstanding the verdict.

The judgment is reversed, with direction to the trial court to reinstate the verdict.

ROBINSON, C. J., MAIN, MILLARD, and DRIVER, JJ., concur.