[No. 18553-2-III. Division Three. February 27, 2001.]

JAMES A. STANSFIELD, *Appellant*, v. DOUGLAS COUNTY,
*Defendant*, THE STATE OF WASHINGTON,
ET AL., *Respondents*.

2

4

*Robert F. Hedrick*; and *Mark E. Stansfield* (of *Stansfield Law Firm*), for appellant.

*Christine O. Gregoire, Attorney General,* and *Catherine Hendricks, Assistant,* for respondents.

KURTZ, C.J. — James A. Stansfield, M.D., was tried for the murders of his wife and Fred Smith, a friend. In the middle of the trial for these murders, the prosecutor moved to dismiss the charges. Dr. Stansfield subsequently filed suit against Douglas County and the State of Washington. All claims against the State were dismissed on summary judgment. In this appeal of his case against the State, Dr. Stansfield contends the court erred by dismissing his claims because material issues of fact exist supporting his claims of malicious prosecution, false arrest, negligent testing, negligent infliction of emotional distress, outrage, and defamation. We affirm the judgment of the trial court.

## FACTS

James A. Stansfield, M.D., was prosecuted for murdering his wife, Patricia Stansfield, and Fred Smith, the husband

of his alleged mistress. The prosecutor's theory was Dr. Stansfield administered Valium and Haldol to his wife, which in combination with the substantial amount of alcohol she had consumed, either caused her death or would have left her "quite subdued and vulnerable to both 'postural asphyxia' or a soft pillow." Additionally, the prosecutor alleged that Dr. Stansfield murdered Mr. Smith by drugging him with Haldol until he was incapacitated, beating him to death, and then placing his body in a staged car wreck.

The prosecutor had evidence that a short time before Mrs. Stansfield's death, Dr. Stansfield purchased a four-ounce bottle of the liquid form of a prescription sedative known as Haldol. Haldol is a colorless, tasteless liquid that would be undetectable when added to other liquids. Doses as low as two milligrams could induce sleepiness and high doses can lead to stupor, unconsciousness, and death.

When questioned, Dr. Stansfield told the pharmacist that the drug was to control behavior problems in his grandchildren. The pharmacist told the police that the purchase was unusual because: (1) Haldol is generally prescribed only for psychiatric patients and was not generally used for behavior modification, especially in children; (2) nearly all Haldol prescriptions are in the pill form and the liquid form is very rarely used; and (3) Dr. Stansfield had been retired since 1985.

The pharmacist informed the police that Dr. Stansfield purchased six vials of injectable Valium. Additionally, Dr. Stansfield purchased a small quantity of chlorohydrate capsules. Chlorohydrate is a tranquilizer that is commonly known as "knockout drops."

The county prosecutors requested blood testing in this case from the Washington State Toxicology Laboratory (State Lab). Barry K. Logan, Ph.D., is the supervisor of the State Lab. Standard testing indicated that Mrs. Stansfield had Valium and Haldol in her system at the time of her death, along with a blood-alcohol concentration of .34.

According to Dr. Logan, the "generally accepted standard

in forensic toxicology is that drug identification should be made using one chemical method and confirmed by a second method which is based on a different chemical property of the molecule. There is no requirement that confirmation be made by [Gas Chromatograph-Mass Spectrometry] or any other particular test."

Initial tests on Mr. Smith's blood revealed the presence of Haldol. Valid results were obtained from two of three tests. The two tests that indicated that presence of the drug were the High Performance Liquid Chromatography and the Gas Chromatograph with Nitrogen-Phosphorus Detection. The third test that was attempted was the Gas Chromatograph-Mass Spectrometry, a test that is generally considered the most irrefutable method of testing. The result of this test neither confirmed nor eliminated the presence of Haldol. The State Lab did not retain test results or data from this test. Dr. Logan was not aware that the mass spectrometry test had been performed on Mr. Smith's sample until the time of trial.

The State Lab was asked to conduct tests on embalmed liver samples from Mr. Smith. Dr. Logan attempted to use the mass spectrometry test on the liver samples. However, the test again did not produce a valid result, and the result and data were not saved.

Subsequently, the liver samples were sent to a highly regarded independent laboratory, the Chemical Toxicology Institute in California, for additional testing. The Institute conducted both the gas chromatography with nitrogen test, as well as the mass spectrometry test. The gas chromatography confirmed the presence of Haldol, but the mass spectrometry could not generate a valid result. The doctors at the Institute explained that an embalmed liver was not an ideal sample to test using the mass spectrometry, and that mass spectrometry was not the optimum technique to test for Haldol.

Prior to conducting the tests, Dr. Logan received and reviewed a prescription drug profile for Mr. Smith. The drug profile listed all the medications that Mr. Smith might

have in his system. Dr. Logan did not recognize any drugs on that list that would potentially interfere with or invalidate the tests for Haldol. One drug on the list was Cardizem, a heart medication.

As the trial began, Dr. Logan asked Dr. David Predmore, the laboratory supervisor, to attempt the mass spectrometry test again. After he testified, Dr. Logan learned that Dr. Predmore was able to identify Haldol in Mr. Smith's liver sample. However, Dr. Predmore had also identified Cardizem, a drug that exhibits retention properties similar to Haldol. Dr. Logan explained that "[t]his created a problem, in that while [Cardizem] was on the list of prescribed drugs I had been given for Fred Smith, it was not previously recognized that [Cardizem] could interfere with testing for Haldol." The court excluded the results of these last tests at trial, due to the fact they had been conducted the week of trial.

As a result of this information, Dr. Logan theorized that the presence of the Cardizem could have been responsible for the early problems in obtaining a valid result. Moreover, Dr. Logan was now concerned that the presence of Cardizem may have interfered with the earlier tests that did confirm the presence of Haldol. He contacted the Institute, and they informed him that Cardizem could not have interfered with their testing.

█ The defense presented expert witnesses who testified that because there was no mass spectrometry of Mr. Smith's blood, the tests must be considered negative. The expert concluded, "The State proved that Fred Smith's blood did not have Haldol in it." Another expert was asked if Haldol was present in Mr. Smith, and he replied it was not.[1]

---

[1] However, the question was asked a second time on redirect, arguably in a more accurate manner, but Dr. Stansfield notably failed to provide the transcript page with the answer. This problem permeates the record. Dr. Stansfield provided isolated pages from the trial transcript for review on appeal. The incomplete record renders it often impossible to discern who is testifying, as well as the context in which the questions were asked and answered. "The party seeking review has the burden of perfecting the record so that the reviewing court has before it all of the relevant evidence." *Bulzomi v. Dep't of Labor & Indus.*, 72 Wn.

After the defense presented its case, the State wanted to call a toxicologist in rebuttal. Dr. Logan was not available. The only toxicologist from the State Lab available was Dr. Pat Friel. Dr. Friel's opinion, in contrast to Dr. Logan's, was that the tests confirming the presence of Haldol were compromised by the failure to control for Cardizem. As a result of this situation, combined with other evidentiary problems encountered at trial, the prosecutor concluded that he could not satisfy his burden of proof and dismissed the charges.

*Procedural History.* Initially, Dr. Stansfield filed a complaint in federal court, alleging a variety of claims, including 42 U.S.C. § 1983, false arrest, malicious prosecution, intentional infliction of emotional distress, negligent training and supervision, false imprisonment, and defamation. While that lawsuit was pending, Dr. Stansfield filed a second lawsuit in Douglas County, alleging negligent investigation and the tort of outrage. Thereafter, the federal court dismissed all state-based causes of action without prejudice. More than two years after the dismissal of the federal suit, Dr. Stansfield was allowed to amend his state lawsuit to add new causes of action. These new causes of action were the same claims dismissed from the federal lawsuit—false arrest, malicious prosecution, infliction of emotional distress, and defamation.

The State moved for summary judgment. The court granted the State's motion and dismissed all claims against it. Dr. Stansfield appeals.

■■ *Standard of Review.* This court reviews an order granting summary judgment de novo. The court engages in the same inquiry as the trial court—is there a genuine issue as to any material fact and is the moving party entitled to judgment as a matter of law? The court considers the evidence and the reasonable inferences therefrom in a light

App. 522, 525, 864 P.2d 996 (1994) (citing *State v. Vazquez*, 66 Wn. App. 573, 583, 832 P.2d 883 (1992)). "An insufficient record on appeal precludes review of the alleged errors." *Bulzomi*, 72 Wn. App. at 525 (citing *Allemeier v. Univ. of Wash.*, 42 Wn. App. 465, 472-73, 712 P.2d 306 (1985)).

most favorable to the nonmoving party. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). A party is entitled to summary judgment if the party can show that there is an absence of evidence supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225-26, 770 P.2d 182 (1989).

 *Malicious Prosecution.* In order to maintain an action for malicious prosecution in this state, Dr. Stansfield must plead and prove the following elements: (1) that the prosecution was instituted or continued by the defendant; (2) that there was want of probable cause for the institution or continuation of the prosecution; (3) that the proceedings were instituted or continued through malice; (4) that the proceedings terminated on the merits in favor of the plaintiff, or were abandoned; and (5) that the plaintiff suffered injury or damage as a result of the prosecution. *Hanson v. City of Snohomish*, 121 Wn.2d 552, 558, 852 P.2d 295 (1993); *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wn.2d 485, 497, 125 P.2d 681 (1942). "Although all elements must be proved, malice and want of probable cause constitute the gist of a malicious prosecution action." *Hanson*, 121 Wn.2d at 558. If probable cause is established, the action fails, for probable cause is a complete defense to an action for malicious prosecution. *Peasley*, 13 Wn.2d at 499. The burden of proof rests upon the plaintiff. *Id.* at 498.

In this case, Dr. Stansfield alleges that the State instituted or continued the prosecution because the State Toxicology Laboratory provided false information by informing the prosecution that Haldol was present in Mr. Smith's blood. Therefore, Dr. Stansfield concludes, the State Lab acted as a complaining witness. The State responds by pointing out that the State Lab personnel make no charging recommendations, nor do they have any control over the pursuit or prosecution of criminals.

In support of his argument, Dr. Stansfield relies upon *Creelman v. Svenning*, 1 Wn. App. 402, 461 P.2d 557 (1969) and *McCord v. Tielsch*, 14 Wn. App. 564, 544 P.2d 56 (1975).

Dr. Stansfield's reliance on *Creelman* is misplaced. In that case, Mr. Creelman and Mr. Svenning were adjoining property owners. Their respective deeds provided that they shared a joint easement over a road that connected their properties. After Mr. Svenning took possession of the property, he blocked the road. Mr. Creelman continued to assert he had a right to use the roadway. Mr. Svenning initiated criminal proceedings against Mr. Creelman, charging him with criminal trespass. Mr. Creelman was arrested and jailed. The case was dismissed after the State presented its evidence. *Creelman*, 1 Wn. App. at 404. The trial court found that Mr. Svenning instituted the criminal prosecution as the result of malice, which was "a desire to resolve the dispute in an inexpensive way and a desire to gain a private advantage." *Id.*

The differences between *Creelman* and the case at issue are obvious. Mr. Svenning was aware of the shared easement, yet determined the simplest way to solve his problem was to claim Mr. Creelman was trespassing. In this case, the State Lab did not institute a criminal action, nor does the evidence indicate it fabricated test results. As such, *Creelman* does not support Dr. Stansfield's malicious prosecution claim.

The *McCord* case provides better guidance. In *McCord*, William McCord stood outside the Seattle Center Opera House soliciting signatures for an initiative petition. Mr. McCord was asked to move by security personnel, but he refused. The Opera House's general director, Glynn Ross, asked two Seattle policemen for assistance. Mr. Ross explained that a man was causing a disturbance in an area rented by the Opera Association and that he had refused to move. Mr. McCord again refused to move at the officer's request. As a result, he was arrested and booked for trespassing, and then charged and acquitted of disturbing the peace. *McCord*, 14 Wn. App. at 565. Mr. McCord sued Mr. Ross and the city for malicious prosecution, arguing that the area in which he was standing was not covered by the lease with the Opera House.

The *McCord* court noted that one is subject to liability for the unlawful arrest of another if he invites or participates in the arrest. *Id.* at 566. The court cited *Parker v. Murphy*, 47 Wash. 558, 92 P. 371 (1907) for the proposition that malicious prosecution will not be found when a defendant "does nothing more than detail his version of the facts to a policeman and ask for his assistance, leaving it to the officer to determine what is the appropriate response, at least where his representation of the facts does not prevent the intelligent exercise of the officer's discretion." *McCord*, 14 Wn. App. at 566.

Here, the State Lab conducted tests and provided results to the authorities as requested. No evidence indicates any Lab personnel attempted to initiate or pursue the criminal prosecution of Dr. Stansfield. The State Lab merely provided information to the prosecutor, much like Mr. Ross provided information to police in *McCord*. The prosecutor was free to analyze the information in light of the rest of the evidence gathered in the course of the investigation. Moreover, it is doubtful that the Lab results, standing alone, would have provided the police with sufficient evidence to charge Dr. Stansfield for the two murders.

Dr. Stansfield has not established the first element to sustain a claim of malicious prosecution. Reasonable minds cannot differ as to whether the State Lab initiated or continued the prosecution against Dr. Stansfield and, therefore, it was properly determined as a matter of law that the State was not liable for malicious prosecution and the claim was dismissed on summary judgment. *See Ruffer v. St. Frances Cabrini Hosp.*, 56 Wn. App. 625, 628, 784 P.2d 1288 (1990).

 *Negligence.* The threshold determination in a claim of negligence is the existence of a duty to the plaintiff, which is a question of law. *Taylor v. Stevens County*, 111 Wn.2d 159, 163, 168, 759 P.2d 447 (1988). "In general, a claim for negligent investigation does not exist under the common law of Washington." *Pettis v. State*, 98 Wn. App. 553, 558, 990 P.2d 453 (1999). That rule recognizes the

chilling effect such claims would have on investigations. *Corbally v. Kennewick Sch. Dist.*, 94 Wn. App. 736, 740, 973 P.2d 1074 (1999) (citing *Dever v. Fowler*, 63 Wn. App. 35, 45, 816 P.2d 1237, 824 P.2d 1237 (1991)).

Dr. Stansfield argues that a distinction exists between negligent investigation and the allegations that the State Lab was negligent in carrying out its statutory duties. He provides no authority for this proposition.

■ Under RCW 68.50.107, the State Toxicology Laboratory has the duty of performing "all necessary toxicologic procedures requested by all coroners, medical examiners, and prosecuting attorneys." Under the public duty doctrine, liability may not be imposed on the State for the negligent conduct of a public official unless the duty breached is owed to a particular individual rather than to the public as a whole. *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 529, 799 P.2d 250 (1990); *see also Taggart v. State*, 118 Wn.2d 195, 218, 822 P.2d 243 (1992) ("The question whether an exception to the public duty doctrine applies is thus another way of asking whether the State had a duty to the plaintiff.").

■ Recognized exceptions to the public duty doctrine include (1) the special relationship; (2) the failure to enforce; (3) the duty to prevent a third person from causing harm; and (4) the good Samaritan. *Cameron v. Janssen Bros. Nurseries, Ltd.*, 7 F.3d 821, 825 (9th Cir. 1993).

■ The "special relationship" exception is a "focusing tool" used to determine whether the government owes a general duty to the public or whether that duty is focused on the plaintiff. *Taylor*, 111 Wn.2d at 166. To establish a special relationship, the plaintiff must show (1) some form of privity or direct contact between the government agency and plaintiff that sets the plaintiff apart from the general public; (2) the agency gave the plaintiff specific assurances that resulted in the agency undertaking a duty; and (3) the plaintiff justifiably relied upon those assurances. *Id.* If a plaintiff makes this showing, the "government then owes the plaintiff a duty of due care to ensure that the assur-

ances given are correct." *Meaney v. Dodd*, 111 Wn.2d 174, 179, 759 P.2d 455 (1988).

The Washington Supreme Court addressed this exception in *Beal v. City of Seattle*, 134 Wn.2d 769, 954 P.2d 237 (1998), holding that a municipality could be liable to an individual where a relationship exists or has developed between the plaintiff and the municipality's agents giving rise to a duty to perform a mandated act for the benefit of a particular person or class of persons. *Id.* at 785. "The special relationship exception is a narrow one which requires the plaintiff to have relied on assurances he specifically sought and which the government expressly gave." *Pepper v. J.J. Welcome Constr. Co.*, 73 Wn. App. 523, 534-35, 871 P.2d 601 (1994).

In this case, Dr. Stansfield has not shown that the State Toxicology Laboratory owes him a duty that is different from the duty that it owes to the general public. Moreover, he has not offered evidence that shows the existence of a special relationship between him and the State Toxicology Laboratory, justifying an exception to the public duty doctrine. Because we conclude as a matter of law that there was no duty to Dr. Stansfield, we affirm the superior court's summary judgment dismissal of his negligence claim.

*Negligent Infliction of Emotional Distress.* "General tort principles create an independent cause of action for negligent infliction of emotional distress for a plaintiff who can establish the elements of duty, breach, proximate cause and damages." *Estate of Lee v. City of Spokane*, 101 Wn. App. 158, 176, 2 P.3d 979, *review denied*, 142 Wn.2d 1014 (2000) (citing *Hunsley v. Giard*, 87 Wn.2d 424, 434, 553 P.2d 1096 (1976)). " 'The element of foreseeability plays a large part in determining the scope of defendant's duty.' " *Estate of Lee*, 101 Wn. App. at 176 (quoting *Hunsley*, 87 Wn.2d at 435).

In this case, the State Toxicology Laboratory had no duty to Dr. Stansfield. The public duty doctrine, as discussed earlier, precludes a duty under these circumstances. Because Dr. Stansfield has failed to show that an exception

applies to his case, the public duty doctrine prevents his recovery for negligent infliction of emotional distress. The trial court properly dismissed this claim.

 *Outrage.* The elements of outrage are (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress. *Rice v. Janovich*, 109 Wn.2d 48, 61, 742 P.2d 1230 (1987).

Liability will exist " 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291 (1975) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). "The question of whether certain conduct is sufficiently outrageous is ordinarily a question for a jury." *Phillips v. Hardwick*, 29 Wn. App. 382, 387, 628 P.2d 506 (1981) (citing *Jackson v. Peoples Fed. Credit Union*, 25 Wn. App. 81, 84, 604 P.2d 1025 (1979)). However, if reasonable minds could not differ on whether the conduct has been sufficiently extreme and outrageous to result in liability, summary judgment is proper. *Phillips*, 29 Wn. App. at 387.

The court is directed to consider:

> (a) the position occupied by the defendant; (b) whether plaintiff was peculiarly susceptible to emotional distress, and if defendant knew this fact; (c) whether defendant's conduct may have been privileged under the circumstances; (d) the degree of emotional distress caused by a party must be severe as opposed to constituting mere annoyance, inconvenience or the embarrassment which normally occur in a confrontation of the parties; and, (e) the actor must be aware that there is a high probability that his conduct will cause severe emotional distress and he must proceed in a conscious disregard of it.

*Id.* at 388 (citing RESTATEMENT, *supra*, § 46 cmts. e, f, and g).

In this case, Dr. Stansfield has not proven extreme and outrageous conduct on the part of the State. He contends

that the State's acts that were outrageous included the failure to retain the test results of the inconclusive mass spectrometry tests, the failure to initially control for Cardizem in the testing, and alleged "secret" testing of Mr. Smith's blood. However, assuming these allegations are all true for purposes of summary judgment, none of these alleged acts arise to conduct that is " 'atrocious, and utterly intolerable in a civilized community.' " *Grimsby*, 85 Wn.2d at 59 (quoting RESTATEMENT, *supra*, § 46 cmt. d). The State Lab gave reasonable explanations for its acts in testing Mr. Smith's samples. Moreover, these acts are not sufficiently extreme to support a claim for outrage. In sum, reasonable minds would not differ that the alleged acts of the State are not sufficient to support a claim of outrage. The court did not err in dismissing this claim on summary judgment.

 *Defamation.* To recover on a defamation claim, Dr. Stansfield must prove: (1) falsity; (2) unprivileged communication; (3) fault; and (4) damages. *Mark v. Seattle Times*, 96 Wn.2d 473, 486, 635 P.2d 1081 (1981). "The degree of fault necessary to make out a prima facie case of defamation depends on whether the plaintiff is a private individual or a public figure or public official. If the plaintiff is a private individual, a negligence standard of fault applies." *Bender v. City of Seattle*, 99 Wn.2d 582, 599, 664 P.2d 492 (1983).

The police enjoy a qualified privilege in releasing information to the press and public in the course of a criminal investigation. *Id.* at 601. Proof of the abuse of a qualified privilege must be established by clear and convincing evidence, not simply by a preponderance of the evidence. *Id.* Additionally, proof of knowledge or reckless disregard for the falsity of the statement is necessary to establish abuse of a qualified privilege. *Id.*

 Dr. Stansfield does not support his claim with evidence of allegedly defamatory statements concerning him and attributable to the State. Rather, Dr. Stansfield alleges that the State Lab personnel defamed him because they provided false statements that were used and relied

upon to bring false murder charges against him. The problem with Dr. Stansfield's analysis is that the alleged defamatory statements were not about him. The statements from the State Lab were simply about the presence or absence of particular drugs in the blood of the two victims. Dr. Stansfield has failed to present any evidence indicating that the State Lab made any statements about him or his culpability whatsoever.

The court properly dismissed his claim on summary judgment.

*Vicarious Liability.* Dr. Stansfield contends that the State has vicarious liability for the acts of Douglas County. He bases his theory of express agency between the State and County based on the statutes authorizing the establishment of prosecutors. He finds support for his proposition in the recent holding in *Whatcom County v. State*, 99 Wn. App. 237, 993 P.2d 273, *review denied*, 141 Wn.2d 1001 (2000).

An agency relationship may exist, either expressly or by implication, when one party acts at the instance of and, in some material degree, under the direction and control of another. *Matsumura v. Eilert*, 74 Wn.2d 362, 368, 444 P.2d 806 (1968). Both the principal and agent must consent to the relationship. *Moss v. Vadman*, 77 Wn.2d 396, 402-03, 463 P.2d 159 (1969). The burden of establishing the agency relationship rests upon the party asserting its existence. *Hewson Constr., Inc. v. Reintree Corp.*, 101 Wn.2d 819, 823, 685 P.2d 1062 (1984).

"Before the sins of an agent can be visited upon his principal, the agency must be first established." *Matsumura*, 74 Wn.2d at 363. Under Washington law, an agency relationship is created, either expressly or by implication, "when one party acts at the instance of and, in some material degree, under the direction and control of another." *Hewson*, 101 Wn.2d at 823. Consent and control are the essential elements of the relationship. *Moss*, 77 Wn.2d at 403.

An agency relationship does not depend on an express

understanding, but may arise out of the conduct of the parties. It does not exist unless the facts, either expressly or by inference, establish that one person is acting at the instance of and in some material degree under the direction and control of the other. "It arises from manifestations that one party consents that another shall act on his behalf and subject to his control, and corresponding manifestations of consent by another party to act on behalf of and subject to the control of the other." *Matsumura*, 74 Wn.2d at 368 (citing RESTATEMENT (SECOND) OF AGENCY § 1 (1958)). Whether an agency exists depends on the peculiar facts and circumstances of each case. *Busk v. Hoard*, 65 Wn.2d 126, 130, 396 P.2d 171 (1964) (citing *McCall v. Smith*, 184 Wash. 615, 622, 52 P.2d 338 (1935)).

" 'Control is not established if the asserted principal retains the right to supervise the asserted agent merely to determine if the agent performs in conformity with the contract. Instead, control establishes agency only if the principal controls the manner of performance . . . .' " *Uni-Com N.W., Ltd. v. Argus Publ'g Co.*, 47 Wn. App. 787, 796-97, 737 P.2d 304 (1987) (quoting *Bloedel Timberlands Dev., Inc. v. Timber Indus., Inc.*, 28 Wn. App. 669, 674, 626 P.2d 30 (1981)).

In *Whatcom County*, the estate of Michelle Smith sued a Whatcom County deputy prosecuting attorney for negligence and violation of civil rights pursuant to 42 U.S.C. § 1983. After the wrongful death action was filed, the Whatcom County Prosecutor tendered the case to the Washington State Attorney General, pursuant to RCW 4.92.060 and RCW 4.92.070, contending that his deputy had been acting as a "state officer" and entitled to defense and indemnification by the State of Washington. The Attorney General declined to either defend or indemnify the Whatcom County Deputy Prosecuting Attorney, asserting that the deputy was acting as an agent of the county and not of the state.

Whatcom County filed a declaratory action against the Attorney General of the State of Washington. After cross-

motions for summary judgment, the superior court ordered the Attorney General to defend and indemnify the deputy prosecutor.

Division One of the Court of Appeals affirmed the holding of the superior court. The appellate court reasoned that county prosecutors represent the state, not their counties, when prosecuting violations of state law. For that reason, the court held that the Whatcom County Deputy Prosecutor was acting as a state officer, entitled to statutory defense and indemnification. *Whatcom County*, 99 Wn. App. at 250-51.

We conclude *Whatcom County* is not controlling authority for the present case for three reasons. First, *Whatcom County* was the appeal of a declaratory judgment, concerned with the interpretation of RCW 4.92.060 and RCW 4.92.070. Here, no defendant has requested defense and indemnification under those statutes. Second, only an individual "state officer" who has been named in "an action or proceeding for damages" can request indemnification under RCW 4.92.060 and RCW 4.92.070. Neither the Douglas County Prosecutor nor his deputy have been named as parties to this action. Third, *Whatcom County* involved the allegation of misconduct against an individual prosecutor. In Dr. Stansfield's first amended complaint, he generally alleges that "[o]fficers and employees of Douglas County were negligent in their investigation into whether Dr. James A. Stansfield had any criminal responsibility for the deaths of his wife, Patricia, and friend, Fred Smith." He further states "[i]n particular, Deputy Sheriff Richard Adams and Coroner Robert Bonifaci were tortious and negligent." In short, there are no allegations of tortious conduct leveled against either the prosecutor, the deputy or against the prosecutor's office in Dr. Stansfield's complaint.

We conclude the superior court did not err by dismissing Dr. Stansfield's claim that the State is vicariously liable for

20

the actions of Douglas County.

Affirmed.

SWEENEY and KATO, JJ., concur.

Review denied at 145 Wn.2d 1009 (2001).