IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32508-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | OPINION PUBLISHED |
| ANTONIO ZAMUDIO, JR., | ) | IN PART |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Antonio Zamudio, Jr. appeals his conviction and sentence following a jury trial at which he was found guilty of second degree assault and first degree unlawful possession of a firearm, with a special finding that he was armed with a firearm in committing the assault. He challenges the sufficiency of the State's evidence to support the assault conviction and the firearm enhancement and, for the first time on appeal, he contends that the State failed to demonstrate that convictions included in his offender score had not washed out. He makes a related argument that his trial lawyer provided ineffective assistance when he failed to challenge the offender score used by the court.

Case law permitting unpreserved sentencing errors to be raised for the first time on appeal does not avail Mr. Zamudio, because he fails to demonstrate that any error was

made. He likewise fails to demonstrate prejudice from the acts or omissions of his lawyer. For those reasons, and because the State's evidence was sufficient, we affirm.

FACTS AND PROCEDURAL BACKGROUND

Brian Lumsden was standing in the parking lot of a truck stop in Rock Island, Washington, on the night of November 12, 2013, speaking with David Berndt, a trucker he had just met, when a white Toyota Tundra truck pulling a utility trailer pulled into the lot with its bright lights on. As the Toyota truck passed, Mr. Berndt asked the driver to dim his lights. According to Mr. Lumsden, the truck's lights were "blinding us." Report of Proceedings (RP) at 90.

The driver of the Toyota truck, later identified as the defendant, Antonio Zamudio, Jr., stopped his truck, got out, walked up to the two men, and asked if they had a problem. Mr. Berndt answered that he just wanted Mr. Zamudio to dim his headlights. As recounted by Mr. Lumsden, a seemingly innocuous exchange followed.

It was apparently not innocuous from the point of view of Mr. Zamudio. After first walking away, he turned around, walked up to Mr. Berndt, pulled out a pistol, and held it "[a]bout six inches away from [Mr. Berndt's] face," asking again what his problem was. RP at 93. After holding the gun to Mr. Berndt's face for "about thirty seconds," according to Mr. Lumsden (although Mr. Lumsden testified it "felt longer"), Mr. Zamudio put the pistol away, got back into his truck, and pulled around front to the fuel pumps. RP at 95.

2

Having been informed that someone had pulled a gun on a person in the parking lot, the proprietor of the truck stop notified the county sheriff, providing a description of the truck and trailer and a license plate number. Based on that report, deputy sheriffs located Mr. Zamudio driving eastbound on State Highway 28, stopped him, and placed him under arrest. In checking for any other passengers in his truck, they saw two firearms on the floor behind the passenger's seat that they left in place while obtaining a search warrant. The firearms turned out to be a black Walther PPS .40 caliber handgun loaded with six live .40 caliber rounds and a .12 gauge Westerfield shotgun loaded with one shell in the chamber and three in the magazine tube.

Mr. Zamudio had previously been convicted of a serious offense and was charged with first degree unlawful possession of a firearm, second degree assault, and second degree possession of stolen property. The information included a special allegation that he had been armed with a firearm in committing the assault.

A jury found Mr. Zamudio guilty of second degree assault and unlawful possession of a firearm in the first degree. It returned a special verdict finding that Mr. Zamudio was armed with a firearm at the time of the assault.

At the sentencing hearing, the trial court asked whether there was agreement as to criminal history. Mr. Zamudio's lawyer answered, "I believe we do, yes." RP at 251. But when the prosecutor identified the standard range for the assault count, explaining that it was based on "five prior adult felonies and two juvenile felonies," Mr. Zamudio's

3

lawyer interrupted, stating, "I don't think that's accurate." RP at 251-52. After the two lawyers conferred, the prosecutor told the court, "I stand corrected," and requested a brief recess to correct the paperwork to include Mr. Zamudio's 2001 conviction for attempting to elude a pursuing police vehicle. RP at 252. There was no discussion at sentencing about whether any of Mr. Zamudio's prior convictions had washed out. The defense lawyer's interruption and correction resulted in an increase in Mr. Zamudio's offender score from seven to eight.

The State recommended a sentence at the high end of the standard range for each count, explaining that Mr. Zamudio

> [h]as an extensive criminal history starting with juvenile felonies in '96 and unabated through 2005. 2005 he was sentenced to prison and got out and was only out maybe a year and a half, two years when this offense was committed.

RP at 254.

The court ultimately imposed 70 months for the assault plus 36 months for the enhancement, and 120 months for the unlawful possession of a firearm, to run concurrently. Mr. Zamudio appeals.

## ANALYSIS

Mr. Zamudio makes four assignments of error on appeal: (1) his offender score was miscalculated, (2) he received ineffective assistance of counsel at sentencing, (3) the State failed to prove that the firearm was "operable" for purposes of the firearm

4

enhancement, and (4) the State failed to establish fear and apprehension on the part of the named victim. Appellant's Br. at 1. We address the first two assignments of error, which are related, and then turn to the third and fourth.

### I. Right to challenge offender score calculation

A defendant's offender score, together with the seriousness level of his current offense, dictates the standard sentence range used in determining his sentence. RCW 9.94A.530(1). To calculate the offender score, the court relies on its determination of the defendant's criminal history, which the Sentencing Reform Act (SRA), chapter 9.94A RCW, defines as "the list of a defendant's prior convictions and juvenile adjudications, whether in this state, in federal court, or elsewhere." RCW 9.94A.030(11). Prior convictions result in offender score "points" in accordance with rules provided by RCW 9.94A.525. Prior convictions will not be counted as points if, through crime-free time spent in the community, they have "washed out" according to criteria provided by statute. Presently, and at the time Mr. Zamudio was sentenced, class C prior felony convictions other than sex offenses are not included in the offender score

> if, since the last date of release from confinement (including full-time residential treatment) pursuant to a felony conviction, if any, or entry of judgment and sentence, the offender had spent five consecutive years in the community without committing any crime that subsequently results in a conviction.

RCW 9.94A.525(2)(c).

5

"In determining the proper offender score, the court 'may rely on no more information than is admitted by the plea agreement, or admitted, acknowledged, or proved in a trial or at the time of sentencing.'" *State v. Hunley*, 175 Wn.2d 901, 909, 287 P.3d 584 (2012) (quoting RCW 9.94A.530(2)). Sentencing information or facts are "'admitted[ or] acknowledged . . . at the time of sentencing'" for this purpose if they are *affirmatively* admitted or acknowledged; the mere failure to object to a prosecutor's assertions of criminal history does not constitute such an acknowledgment. *State v. Mendoza*, 165 Wn.2d 913, 922, 205 P.3d 113 (2009) (quoting former RCW 9.94A.530(2) (2005)).

Our Supreme Court has held, as a limit on what can be effectively acknowledged by a defendant, that "a defendant cannot agree to punishment in excess of that which the Legislature has established." *In re Personal Restraint of Goodwin*, 146 Wn.2d 861, 873-74, 50 P.3d 618 (2002). It has also recognized this type of sentencing error as a non-rule-based exception to RAP 2.5(a), which provides, generally, that errors cannot be raised for the first time on appeal. In announcing that a defendant cannot agree to legally excessive punishment, the court observed that "[t]here are limitations on this holding," explaining:

> While waiver does not apply where the alleged sentencing error is a *legal error* leading to an excessive sentence, waiver can be found where the alleged error involves an agreement to facts, later disputed, or where the alleged error involves a trial court discretion.

*Id.* at 874 (alteration in original).

6

*Goodwin* involved legal error arising from a failure to treat prior convictions as washed out, but the court was applying a former statute that did not base "wash outs" on a particular defendant's time spent crime-free in the community. Instead, former RCW 9.94A.030(12)(b) (1989) provided that prior juvenile class B and C felony convictions no longer counted toward an offender score once a defendant turned 23. *Goodwin*, 146 Wn.2d at 867. From the date of birth and conviction history set forth in Goodwin's judgment and sentence, it was apparent that crimes the sentencing court had counted toward the offender score had washed out. The State conceded that this indisputable error had been made but argued that Goodwin had waived the issue by agreeing to the criminal history included in his statement on plea of guilty.

*Goodwin* involved a collateral attack on a sentence, and it was important that Goodwin's judgment and sentence appeared invalid on its face so as to avoid the one-year time bar of RCW 10.73.090. But cases following *Goodwin* have clarified that his clear showing that a sentencing error *had* been made—not just *might* have been made—was also critical to his right to raise the issue for the first time on appeal. In *State v. Ross*, 152 Wn.2d 220, 231, 95 P.3d 1225 (2004), a unanimous supreme court explained that "*Goodwin* turned on the fact that defendant's sentence contained obvious errors," and that "[t]o invoke the waiver analysis set forth in *Goodwin*, a defendant must [either] show *on appeal* or by way

7

of a personal restraint petition that an error of fact or law exists within the four corners of his judgment and sentence." (Emphasis added.) *Accord, Mendoza,* 165 Wn.2d at 927-28 (citing *Ross,* 152 Wn.2d at 232, and adding that "[s]ince neither defendant could show . . . an obvious error in his sentence, it was not miscalculated, and any objection to the inclusion of acknowledged criminal history was waived."); *cf. State v. Wilson,* 170 Wn.2d 682, 690 & n.4, 244 P.3d 950 (2010) (suggesting that what is critical is to demonstrate that an error has in fact been made, not that it can be found within the four corners of the judgment and sentence).

*Ross* involved the consolidated cases of three criminal defendants, each of whom argued that the State had failed to prove the comparability of their out-of-state convictions to Washington State felony crimes. Each sought remand for resentencing. By the time of appeal, one defendant's case was moot and the other two defendants—Hunter and Legrone—asserted that their out-of-state crimes were not comparable to Washington crimes and should not have been counted, but could not demonstrate that in the record on appeal. The *Ross* court held that "*Goodwin* does not control the inquiry here." 152 Wn.2d at 231. It held that neither defendant had met a "threshold requirement" for arguing unpreserved sentencing error because "neither has shown that the sentencing court committed *any* arguable factual or legal error by including their prior out-of-state or federal

8

convictions in their offender score." *Id.* at 232 (alteration in original). Elsewhere, it noted that in two key cases relied on in *Goodwin*, the defendants had "pointed to specific errors to support their claims." *Id.* at n.3 (citing *State v. Majors*, 94 Wn.2d 354, 616 P.2d 1237 (1980) and *State v. Nitsch*, 100 Wn. App. 512, 997 P.2d 1000 (2000)).

The criminal history agreed to by the defense and reflected on Mr. Zamudio's judgment and sentence consists of two juvenile adjudications in 1996 and 1999, and six adult convictions for crimes committed between June 2001 and June 2004. Mr. Zamudio's juvenile adjudications and all of his adult convictions other than his 2005 conviction were for class C felonies. Mr. Zamudio contends for the first time on appeal that because the current crimes were committed in November 2013 and his last prior conviction was for delivery of methamphetamine, for which he was sentenced in February 2005, all of his prior class C felonies had washed out and should not have been included in his offender score and the State failed to offer evidence otherwise. Br. of Appellant at 7.

Not only has Mr. Zamudio failed to show that any of his class C felonies had washed out before he committed the current crimes on November 12, 2013, but his suggestion that they might have washed out is dubious at best. Mr. Zamudio's most recent conviction as of the time of his sentencing in this case was for delivery of methamphetamine in violation of RCW 69.50.401(2)(b). He correctly argues that he was

9

sentenced for the crime on February 2, 2005. Delivery of methamphetamine has a seriousness level of II. Given that seriousness level and Mr. Zamudio's offender score of 6 at the time, his standard sentence range would have been 60 to 120 months. Even assuming he was sentenced to the low end of the standard range, 60 months would not have passed from the date of his sentence until February 2, 2010. If released at that time, he would not have spent five crime-free years in the community until February 2, 2015. Thus, on the face of it, a wash out of Mr. Zamudio's class C felonies appears highly unlikely. For the crimes to have washed out would require some combination of a low-end or exceptional mitigated sentence, time spent in custody beginning shortly after his crime, and significant earned release time or commutation of his sentence by the governor.

*Ross* is controlling. Because Mr. Zamudio does not demonstrate *any* sentencing error, the right to raise unpreserved sentencing errors recognized in *Goodwin* does not apply. We need not reach the parties' dispute over whether Mr. Zamudio's trial lawyer's statements at the sentencing hearing constituted an acknowledgement.

Affirmed.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with RCW 2.06.040, the rules governing unpublished opinions.

II. Ineffective assistance of counsel

Mr. Zamudio makes a related argument that he received ineffective assistance of counsel because his trial lawyer failed to challenge the calculation of his offender score. "A claim of ineffective assistance of counsel presents a mixed question of fact and law reviewed de novo." *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). "In order to prove ineffective assistance of counsel, a defendant must show that the attorney's performance was deficient and that prejudice resulted." *State v. Levy*, 156 Wn.2d 709, 729, 132 P.3d 1076 (2006). A failure to demonstrate either deficient performance or prejudice defeats an ineffective assistance claim. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995); *see also Strickland v. Washington*, 466 U.S. 668, 700, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

As already discussed, nothing in the record demonstrates that any of Mr. Zamudio's prior class C felony convictions would have washed out under RCW 9.94A.525(2)(c). Because Mr. Zamudio "points to no apparent invalidity on the face of the judgment and sentence and falls short in his attempt to assert an incorrect offender score," he has not shown that his counsel was ineffective in stipulating to his offender score. *See State v. Foster*, 140 Wn. App. 266, 277, 166 P.3d 726 (2007).

III. Evidence sufficiency: firearm enhancement

Mr. Zamudio next argues that the State produced insufficient evidence to prove the firearm enhancement imposed in connection with his second degree assault

conviction. In deciding a defendant's challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt. *State v. Brown*, 162 Wn.2d 422, 428, 173 P.3d 245 (2007). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Reviewing courts must defer to the trier of fact "on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004), *abrogated in part on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

According to Mr. Zamudio, the State failed to establish that the handgun used in the assault was operable. He claims that "[t]he only way to determine if a weapon is functional is to test it." Br. of Appellant at 9. The State presented evidence at trial that the firearm used in the assault was a black Walther PPS .40 caliber handgun loaded with six live .40 caliber rounds. RCW 9.41.010(9) defines a "firearm" as "a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder." The pattern instruction provided to the jury is consistent with this definition. CP at 38, jury instruction 10; *see* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 2.10.01, at 54 (3d ed. 2008) (WPIC).

12

In contending that the State was required to prove the firearm's operability, Mr. Zamudio relies on language from *State v. Recuenco*, 163 Wn.2d 428, 437, 180 P.3d 1276 (2008), in which the court stated that "a jury must be presented with sufficient evidence to find a firearm operable under this definition in order to uphold the enhancement." As the State points out, however, Mr. Zamudio's reliance on *Recuenco* is misplaced.

The defendant in *Recuenco* was charged with second degree assault and the State opted to charge him with the lesser enhancement for a deadly weapon, rather than an enhancement for a firearm. *Id.* at 436. The jury was never given a firearm instruction: "[t]he only instruction given to the jury regarding sentencing enhancements was the special verdict for a deadly weapon." *Id.* at 439. After the jury found the defendant guilty and returned a special verdict finding that the defendant was armed with a deadly weapon when committing the assault, the State requested the greater three-year mandatory enhancement for use of a firearm. *Id.*

On appeal, our Supreme Court held that the defendant was entitled to have the jury determine beyond a reasonable doubt that he was armed with a firearm and that the trial court lacked authority to sentence Mr. Recuenco for the additional two years associated with the greater enhancement. *Id.* at 436. A dissent in *Recuenco* reasoned that "because the only deadly weapon discussed at trial was a handgun, it was appropriate to ask for the firearm enhancement at sentencing rather than the charged and convicted deadly weapon enhancement." *Id.* at 437.

13

It was in responding to the position of the dissent that the *Recuenco* court stated

that to prove a firearm enhancement, "the State must introduce facts upon which the jury

could find beyond a reasonable doubt the weapon in question falls under the definition of

a 'firearm,'" and

> [w]e have held that *a jury must be presented with sufficient evidence to find
> a firearm operable under this definition in order to uphold the
> enhancement. State v. Pam*, 98 Wn.2d 748, 754-55, 659 P.2d 454 (1983),
> *overruled in part on other grounds by State v. Brown*, 111 Wn.2d 124, 761
> P.2d 588 (1988)[, *superseded on recons.*, 113 Wn.2d 520, 782 P.2d 1013,
> 787 P.2d 906 (1989) (plurality opinion)].

*Id.* at 437 (emphasis added) (quoting 11 WPIC 2.10.01 (2d ed. Supp. 2005)). In *Pam*, the

court had held that "[a] gun-like object incapable of being fired is not a 'firearm' under

[the statutory] definition" and that "[a] defendant's penalty cannot be enhanced if the

evidence establishes only that he was armed with a gun-like, but nondeadly, object." *Id.*

at 753 (citing *State v. Tongate*, 93 Wn.2d 751, 755, 613 P.2d 121 (1980) (distinguishing

between a "toy gun" and "a gun-like but nondeadly object").

Division II of this court addressed the argument that *Recuenco* requires proof of a

firearm's operability in *State v. Faust*, 93 Wn. App. 373, 379, 967 P.2d 1284 (1998) and

concluded that while *Pam* "could be read as limiting the definition of firearm to a gun

that was operable at the time of crime," a "careful reading of [that case] reveals

otherwise." It explained that the court's holding in *Pam*

> did not limit the definition of a firearm to one capable of being fired during
> the crime. Rather, the distinction was between a toy gun and a gun "in

14

fact." Moreover, the unchallenged instruction in *Tongate* made clear that
an unloaded gun, or one incapable of being fired, was still a deadly weapon
within the meaning of the statute.

*Id.* at 380.

We agree with *Faust*'s reading of *Recuenco* and *Pam*. The State is not required to prove a firearm's operability. In this case, it presented sufficient evidence of what it was required to prove: that the gun Mr. Zamudio used in the assault was a gun "in fact," rather than "a gun-like but nondeadly object." Mr. Lumsden testified to being "[a] hundred percent sure" that Mr. Zamudio was holding a gun, and when police executed a search warrant of Mr. Zamudio's truck shortly after the assault, they found a black Walther PPS .40 caliber handgun loaded with six live .40 caliber rounds. RP at 93. The evidence was sufficient to establish that the gun met the definition of a "firearm" under RCW 9.41.010(9).

IV. Evidence sufficiency: victim fear and apprehension

Finally, Mr. Zamudio challenges the sufficiency of the evidence to support a finding by the jury that he placed the victim, Mr. Berndt, in a reasonable apprehension and imminent fear of bodily injury, where Mr. Berndt did not testify at trial. Mr. Zamudio called the jury's attention to Mr. Berndt's absence from trial, urging it as a shortfall in the State's proof. The jury nonetheless found Mr. Zamudio guilty of the assault.

In charging Mr. Zamudio with second degree assault under RCW 9A.36.021, the information alleged that he "intentionally assault[ed] another and recklessly inflict[ed] substantial bodily harm and/or did assault another with a deadly weapon," identifying the witness as David Berndt. Clerk's Papers (CP) at 21.

"The word 'assault' is not defined in the Washington Criminal Code." *State v. Brown*, 140 Wn.2d 456, 466, 998 P.2d 321 (2000). However, Washington courts have recognized three common law forms of assault: "'(1) an unlawful touching (actual battery); (2) an attempt with unlawful force to inflict bodily injury upon another, tending but failing to accomplish it (attempted battery); and (3) putting another in apprehension of harm.'" *State v. Abuan*, 161 Wn. App. 135, 157, 257 P.3d 1 (2011) (quoting *State v. Elmi*, 166 Wn.2d 209, 215, 207 P.3d 439 (2009)).

Here, the jury was instructed under the third "reasonable apprehension" form of assault. Jury instruction 9 provided that

> [a]n assault is an act, with unlawful force, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

CP at 37; 11 WPIC 35.50, at 547. "Whether there has been an assault in a particular case depends more upon the apprehension created in the mind of the person assaulted than upon the undisclosed intention of the person committing the assault." *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wn.2d 485, 505, 125 P.2d 681 (1942).

16

"In determining the sufficiency of the evidence, circumstantial evidence is not to be considered any less reliable than direct evidence." *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). In the context of assault, "[a] jury may infer specific intent to create fear from the defendant's pointing a gun at the victim, unless the victim knew the weapon was unloaded, but not from mere display." *State v. Eastmond*, 129 Wn.2d 497, 500, 919 P.2d 577 (1996), *overruled on other grounds by State v. Brown*, 147 Wn.2d 330, 340, 58 P.3d 889 (2002). Likewise, "[a]pprehension of a person at whom a revolver is pointed may be inferred, unless he knows it to be unloaded." *State v. Miller*, 71 Wn.2d 143, 146, 426 P.2d 986 (1967); *Peasley*, 13 Wn.2d at 505; *Allen v. Hannaford*, 138 Wash. 423, 425, 244 P. 700 (1926).

The jury heard testimony from Mr. Lumsden, who was standing about three feet to the left of Mr. Berndt at the time of the assault and had a "[v]ery clear" view of what happened. RP at 96. He described Mr. Zamudio's demeanor as "[u]nprovoked anger." RP at 94. According to Mr. Lumsden, Mr. Zamudio "got a little bit out of control," pulled out a "handheld firearm," and held it "[a]bout six inches away from [Mr. Berndt's] face." RP at 92-93. When asked how long Mr. Zamudio held the gun there, Mr. Lumsden responded:

> A. It was probably about thirty seconds or so but it kind of felt longer so I don't know for sure.
> Q. Okay. And so how would you describe [Mr. Berndt's] demeanor? Was he happy?
> A. He was happy before this yes.

17

Q.  Did it change?
A.  Well yeah, he seemed a little frightened.
Q.  What makes you say that?
A.  Because of the look in his eyes.

RP at 95.  The officer who took statements from Mr. Lumsden and Mr. Berndt described

Mr. Berndt's demeanor as "calm but concerned" and testified, "You know, he's a truck

driver and he sees a lot of things but—but he was concerned . . . .[r]egarding what

happened, what he witnessed and what he was the victim of." RP at 134.

Mr. Lumsden was also questioned about his own mental state:

Q.  How did you feel when all of this was going on?
A.  In awe.  Like surreal.
Q.  At any time were you—did you think this was a joke when you saw it—what you saw?
A.  No.  It looked pretty serious to me.
Q.  Did you at any time think [Mr. Zamudio] was joking?
A.  No.
Q.  How did he look?
A.  Serious.  Angry.
Q.  At any time were you fearful about any of this?
A.  Yeah.  I didn't know if I wanted to be a hero at this point or just keep quiet but I chose to keep quiet.
Q.  Okay.  Did you ever think about running away?
A.  Yeah.  But I didn't think that anything was a good idea besides just to kind of freeze right there.
Q.  So you were frozen right there?
A.  Mmm hmm. [Affirmative].

RP at 96.

"[A] juror is expected to bring his or her opinions, insights, common sense, and

everyday life experiences into deliberations." *State v. Carlson*, 61 Wn. App. 865, 878,

18

812 P.2d 536 (1991); *see, e.g., State v. Peterson*, 174 Wn. App. 828, 855, 301 P.3d 1060 (2013) (even without expert testimony, sufficient evidence supported the jury's finding that horses suffered unjustifiable pain and suffering, as required to support animal cruelty conviction). The jury was provided with a description of the incident by a witness in the immediate vicinity of Mr. Berndt who had a clear view of what happened, from which it could reasonably infer that most people under those circumstances would be fearful of bodily harm. That, along with some evidence of Mr. Berndt's demeanor and conduct tending to prove that he experienced such fear, was sufficient.

Affirmed.

Siddoway, C.J.

WE CONCUR:

Korsmo, J.

Fearing, J.

19