
# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 75904-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| ADRIAN DORELL GREENHALGH, | ) | |
| | ) | FILED: April 16, 2018 |
| Appellant. | ) | |
| | ) | |

VERELLEN, J. — The State charged Adrian Greenhalgh with vehicular assault. A jury found Greenhalgh guilty as charged, and the court imposed an 84-month standard range sentence.

Greenhalgh challenges the sufficiency of the evidence supporting his conviction. But viewed in the light most favorable to the State, there was sufficient evidence that he drove under the influence of intoxicating liquor and caused substantial bodily harm to another.

The sentencing court calculated Greenhalgh's offender score as 9. Because we may affirm on any basis supported by the record, and the judgment and sentence includes a list of his previous offenses, the court's offender score calculation is correct.

We affirm.

## FACTS

On April 26, 2015, Adrian Greenhalgh, his brother Antwon,[1] and their friends Demarcus Simmons and Lovely Child "LC" Manuel went to a concert in downtown Seattle. They consumed alcohol throughout the night, and sometime around 2:30 a.m., they went to the Silver Dollar Casino in SeaTac to eat food and "sober up."[2] After approximately "an hour to an hour and a half,"[3] the casino shift manager asked the group to leave because they were being disruptive. Shortly after leaving the casino, Greenhalgh crashed a BMW sedan into a utility pole with Antwon, Simmons, and Manuel inside the car. Manuel suffered a serious brain injury and spent two months in the hospital.

The State charged Greenhalgh with vehicular assault, alleging that he drove while intoxicated and crashed into a utility pole, causing Manuel significant brain damage. A jury found Greenhalgh guilty, and the King County Superior Court imposed an 84-month standard range sentence.

Greenhalgh appeals.

---

[1] We refer to Antwon Greenhalgh throughout this opinion by his first name to avoid confusion.

[2] Report of Proceedings (Aug. 10, 2016) at 334.

[3] RP (Aug. 9, 2016) at 182.

## ANALYSIS

### I. Sufficiency of the Evidence

Greenhalgh argues the State did not prove he committed vehicular assault beyond a reasonable doubt.

A defendant's right to due process requires the State to prove each element of an offense beyond a reasonable doubt.[4] Evidence is sufficient to support a conviction if, viewing the evidence in the light most favorable to the State, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.[5] "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom."[6] "In determining the sufficiency of the evidence, circumstantial evidence is not to be considered any less reliable than direct evidence."[7] While inferences from the evidence must be based on more than speculation, the trier of fact resolves conflicting testimony and weighs the persuasiveness of the evidence.[8] We defer to the trier of fact on issues of conflicting testimony, witness credibility, and persuasiveness of evidence.[9]

---

[4] State v. Hundley, 126 Wn.2d 418, 421, 895 P.2d 403 (1995).

[5] State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

[6] Id.

[7] State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

[8] State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016); State v. Walton, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992).

[9] Walton, 64 Wn. App. at 415-16.

A person commits vehicular assault when he or she operates a vehicle while under the influence of intoxicating liquor and causes substantial bodily harm to another.[10] The State must prove that the defendant's operation of a vehicle was a proximate cause of the victim's substantial bodily harm.

Here, there was sufficient evidence that Greenhalgh, who was intoxicated, drove the BMW into a utility pole, causing a severe brain injury to one of his passengers. Silver Dollar Casino surveillance cameras recorded the events immediately before and after the crash. The video showed the four men leaving the casino at 4:15 a.m. Greenhalgh and Antwon were both visibly intoxicated and had difficulty walking. The men spent nearly 15 minutes in the parking lot. When the sedan left the Casino parking lot, Greenhalgh was driving, Antwon was in the front passenger seat, Simmons was in the backseat behind the driver, and Manuel was in the backseat on the passenger side. Soon after the group left the casino in the early morning hours of April 27, 2015, Robert Nero, the casino's shift manager, learned a car had crashed outside. Nero went outside and saw that a BMW sedan had crashed into a utility pole. The surveillance video showed Nero going outside to investigate the crash within two minutes after Greenhalgh drove out of the parking lot. He approached the car and recognized the four men from the casino. Greenhalgh was in the driver's seat, trying to start the car. Nero saw Antwon in the passenger seat, reaching into his pants for what turned out to be a cellphone. Nero also noticed Simmons leaning into the backseat and shaking Manuel, who

_____

[10] RCW 46.61.522(1)(b).

appeared unconscious. Greenhalgh got out of the car, and Nero told him that police were on the way.

King County Sheriff's Deputy Richard Dosio arrived and saw the crashed sedan, with smoke coming from the hood. No one was in either front seat, but Dosio saw Antwon get out of the rear passenger side, look at him, and put something in some bushes nearby. Dosio later found a liquor bottle in those bushes.

Nero identified Greenhalgh as the person in the driver's seat immediately following the crash, and deputies arrested him. Greenhalgh's blood was drawn nearly three hours after the crash, and his blood-alcohol level was 0.12. Drug recognition expert Deputy Mark Silverstein observed that Greenhalgh appeared intoxicated, his balance was poor, and he swayed approximately four inches from side to side.

Manuel sustained a serious brain injury and spent two months in the hospital. When he was discharged, he still had serious cognitive and memory problems and was unable to care for himself.

At trial, Greenhalgh and Antwon acknowledged they had consumed alcohol, and Greenhalgh drove the car when they left the casino. But they said that when Greenhalgh pulled out of the parking lot, he stopped the car, saw an acquaintance of Manuel's walking down the street, Manuel got out of the car to speak to the man, Greenhalgh got out of the car to vomit, and Manuel's acquaintance agreed to drive the car. According to Greenhalgh and Antwon, Greenhalgh got into the

backseat with Simmons and Manuel and the acquaintance got into the driver's seat, drove away erratically, and crashed into the pole. They testified that after the crash, the acquaintance immediately ran away. No one saw anyone other than Greenhalgh, Antwon, Simmons, and Manuel near the car after the crash. Greenhalgh found the car keys, got into the driver's seat and tried to start the car, to "coast the car back to the casino parking lot."[11] According to Greenhalgh, once he was unable to start the car, he walked across the street to a motel and asked an employee to call an ambulance. He also testified that he asked the motel employee for a room because "the vehicle was crashed," and the men would "need somewhere to go," but the motel employee said there was no vacancy.[12]

Considering the evidence as a whole, any rational fact-finder could conclude beyond a reasonable doubt that Greenhalgh was intoxicated and drove the car into the pole, injuring Manuel. The video evidence showed Greenhalgh in the driver's seat, driving out of the casino parking lot. The car crashed less than two minutes later. Within two minutes, Nero learned of the crash and walked outside to investigate. Within three minutes, Nero saw Greenhalgh in the driver's seat, trying to start the car's engine. Any rational juror could reasonably infer from the circumstantial evidence that Greenhalgh crashed the car.[13]

---

[11] RP (Aug. 10, 2016) at 383.

[12] RP (Aug. 10, 2016) at 387.

[13] Delmarter, 94 Wn.2d at 638 ("In determining the sufficiency of the evidence, circumstantial evidence is not to be considered any less reliable than direct evidence.").

Greenhalgh contends that this inference is speculative because no witness at trial testified to seeing Greenhalgh driving the car at the moment of impact. But his argument overlooks the compelling circumstantial evidence in the surveillance video which showed him stumbling away from the casino to the car, starting the car, driving away, and the short time that elapsed before crashing into the pole. Both Greenhalgh and Antwon admitted being intoxicated at the time. We do not disturb the fact-finder's credibility determinations on appeal. Additionally, Greenhalgh's testimony that he vomited and got into the backseat to sit with Simmons and Manuel is not credible because the photograph admitted at trial shows the backseat center armrest was down, making it impractical that three adult men fit into the backseat with the armrest down.

There was sufficient evidence Greenhalgh operated a vehicle under the influence of intoxicating liquor and caused substantial bodily harm to another.

*II. Offender Score*

Greenhalgh argues the court's findings of fact do not support its offender score calculation.

The State bears the burden of proving a defendant's criminal history by a preponderance of the evidence.[14]

To calculate an offender score, the sentencing court must "(1) identify all prior convictions; (2) eliminate those that wash out; (3) 'count' the prior convictions

---

[14] RCW 9.94A.500(1); State v. Ford, 137 Wn.2d 472, 479-80, 973 P.2d 452 (1999).

that remain in order to arrive at an offender score."[15]

Here, the court's findings specifically incorporate appendix B of the judgment and sentence which lists Greenhalgh's convictions that contribute to his offender score. Greenhalgh's criminal history listed in appendix B reflects an offender score of 9. Each of his four adult felony convictions count as one point each, for a total of four points.[16] Greenhalgh's two adult misdemeanor DUI convictions score as one point each, for two additional points.[17] His seven juvenile convictions count as one half point each, for three and a half more points, rounded down to three.[18]

But Greenhalgh argues the findings do not establish that his class C felonies and serious traffic convictions prior to 2009 did not wash out under RCW 9.94A.525(2). His argument fails.

The Sentencing Reform Act of 1981 provides that an offender score is "the sum of points accrued under this section."[19] The statute then defines a "prior conviction" as "a conviction which exists before the date of sentencing for the offense for which the offender score is being computed."[20] The statute then

---

[15] State v. Moeurn, 170 Wn.2d 169, 175, 240 P.3d 1158 (2010).

[16] RCW 9.94A.525(11); RCW 9.94A.030(26)(a).

[17] RCW 9.94A.525(11); RCW 9.94A.030(45)(a).

[18] RCW 9.94A.525(11).

[19] RCW 9.94A.525.

[20] RCW 9.94A.525(1).

provides that certain prior convictions will not be included in the offender score if certain conditions are met:

> (c) Except as provided in (e) of this subsection, class C prior felony convictions other than sex offenses shall not be included in the offender score if, *since the last date of release from confinement* (including full-time residential treatment) pursuant to a felony conviction, if any, or entry of judgment and sentence, *the offender had spent five consecutive years in the community without committing any crime that subsequently results in a conviction.*
>
> (d) Except as provided in (e) of this subsection, serious traffic convictions shall not be included in the offender score if, *since the last date of release from confinement* (including full-time residential treatment) pursuant to a conviction, if any, or entry of judgment and sentence, *the offender spent five years in the community without committing any crime that subsequently results in a conviction.*[21]

Greenhalgh argues the sentencing court's findings of fact for the offender score calculation are incorrect because they do not address any potentially washed out convictions. He relies on State v. Ramirez, but there, the judgment and sentence itself, regardless of any wash out provisions, did not support the offender score.[22] Greenhalgh offers no compelling authority that Ramirez stands for a broader application.

---

[21] RCW 9.94A.525(2)(c), (d) (emphasis added).

[22] 190 Wn. App. 731, 734, 359 P.3d 929 (2015) ("Significantly, the State agrees that the criminal history as listed in appendix B does not support the offender score. The State points to three additional misdemeanor convictions to explain how it calculated the offender score of 7. Nonetheless, the State argues that it met its burden to prove criminal history because Ramirez 'affirmatively agreed in writing that his offender score was '7.' We reject this argument. The Supreme Court has emphasized "the need for an affirmative acknowledgement by the defendant of facts and information introduced for the purposes of sentencing" before the State will be excused from its burden of providing criminal history. There was no such affirmative acknowledgement in this case.")

Additionally, the record before the trial court was inconsistent with Greenhalgh having spent five years in the community without committing a crime.[23] He was incarcerated in 2009 for 65 months, and the current crime occurred in April 2015.

Greenhalgh suggests the score is incorrect because the sentencing court did not include the specific information regarding time served for each prior crime in its findings of fact. But "[w]e may affirm on any basis supported by the record,"[24] and here, the record is inconsistent with Greenhalgh spending "five years in the community without committing any crime that subsequently results in a conviction."[25]

We conclude the sentencing court properly calculated Greenhalgh's offender score.

---

[23] At sentencing, the court remarked: "And you have an offender's score of nine because you have a lengthy criminal history. You sit before me at about 28 years of age with an offender's score of nine, wherein in 2009 you were sentenced on, let's see, four different counts, the highest of which was 65 months. You were sentenced to the low end of the range for each of those charges, and that seems to be the only time you weren't getting in trouble. You get out, you're driving with a suspended license, which is another indication you can't follow a court's order, you can't stay out of trouble, no matter how many times we try and encourage you to realize that you're only harming yourself. You get stopped for a DUI, and then mere months later, this incident occurs." RP (Sept. 16, 2016) at 473.

[24] Bavand v. OneWest Bank, 196 Wn. App. 813, 825, 385 P.3d 233 (2016).

[25] RCW 9.94A.525(2)(c), (d); see State v. Zamudio, 192 Wn. App. 503, 510-11, 368 P.3d 222 (2016) (reasoning that appellant's "suggestion that [his class C felonies] might have washed out is dubious at best").

### III.  Statement of Additional Grounds for Review

In a statement of additional grounds for review, Greenhalgh argues the State presented insufficient evidence, the police failed to inform him "of his right to additional tests by a professional of his choosing,"[26] and the State shifted the burden of proof in its closing argument.

#### i. Sufficiency of the Evidence

As addressed in Section I of this opinion, there was sufficient evidence for a rational fact-finder to convict Greenhalgh beyond a reasonable doubt.

#### ii. Informed Consent

Our Supreme Court has observed that officers "may obtain a blood alcohol test pursuant to a warrant regardless of the implied consent statute."[27] Police are required to notify individuals of their right to have separate testing when law enforcement chooses to exercise a blood draw through the implied consent statute, as opposed to a search warrant.[28] Here, it is undisputed that law enforcement obtained a warrant for Greenhalgh's blood, thus, his argument fails.

#### iii. Burden Shifting

A prosecutor may commit misconduct by arguing that the defense failed to present witnesses or explain the factual basis of the charges, or asserting the jury should find the defendant guilty because he did not present evidence to support

---

[26] Statement of Additional Grounds for Review at 1.

[27] City of Seattle v. St. John, 166 Wn.2d 941, 946, 215 P.3d 194 (2009).

[28] State v. Turpin, 94 Wn.2d 820, 824-25, 620 P.2d 990 (1980); State v. Morales, 173 Wn.2d 560, 569, 269 P.3d 263 (2012).

his theory of defense.[29] But merely mentioning "that defense evidence is lacking does not constitute prosecutorial misconduct or shift the burden of proof to the defense."[30]

Here, Greenhalgh cites various portions of the State's closing argument in which it walked the jury through the jury instructions. The State did not argue the defense failed to present witnesses, or explain the factual basis of the charges, or ask the jury to find him guilty because he did not present evidence to support his theory of defense. His arguments fail.

We affirm.

WE CONCUR:

_____

Trickey, J

_____

_____

---

[29] State v. Jackson, 150 Wn. App. 877, 885, 209 P.3d 553 (2009).

[30] Id. at 885-86.