IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84996-4-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| SCOTT GREGORY DAVIS, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, C.J. — Scott Gregory Davis was arrested after pointing a gun at officers during an eviction.  A jury convicted Davis on two counts of second degree assault with a firearm, one count of second degree assault, and one count of unlawful possession of a firearm in the second degree.  Davis appeals, arguing his constitutional right to self-representation was violated, insufficient evidence exists to support his second degree assault conviction of Deputy Brown, the State committed prosecutorial misconduct, the court erroneously excluded evidence and imposed exceptional sentencing, and the victim penalty assessment (VPA) should be stricken.

Because Davis's constitutional and statutory rights were not violated and the trial court did not err in its rulings or abuse its discretion, we affirm the judgment and sentence, but remand to the trial court to strike the VPA.

FACTS

Background

In 2019, Scott Davis began renting a garage from Tian Jun Tang for storage purposes. James Greeno, Tang's boyfriend, acted as property manager. Greeno continued in this role after Tang's death in 2020. Greeno subsequently discovered that Davis was living in the garage in violation of the lease and had not been paying rent. Greeno spoke with Davis about vacating the premises and, after Davis failed to leave, pursued formal eviction proceedings, serving Davis and posting a notice of eviction on the door to the garage. Davis remained on the property and the court granted a writ of restitution.

In July 2022, pursuant to the writ of restitution, Snohomish County Sheriff's Department Sergeant Eric Fournier and Deputies Alexander Ross and Tyler Brown went to the property to evict Davis. The officers knocked on the access door to the garage and announced themselves multiple times but did not receive a response. The officers began pounding on both the outside access door to the garage and the rollup garage doors for several minutes, identifying themselves and yelling, "police" and "Scott, it's eviction day. You need to come out." After receiving no response, Greeno took the officers inside the home to use an alternative access door to the garage.

Fournier and Ross made their way into the garage while Brown stayed by the doorway. While Ross went to open the rollup door to the single-car bay of the garage, Fournier made his way through the clutter in the garage toward a tarp-covered car to see if anyone was sleeping in the car. After Ross opened the

2

garage door, Brown made his way back through the house entrance and outside toward the open garage door.[1]

When Fournier got close to the car, he looked up to see Davis leaning over the rear side of the car and pointing a gun directly at his face. Fournier, scared for his life, yelled "sheriff's office" and "police" to make sure Davis knew he was law enforcement. At this point, Brown had positioned himself outside behind a pillar between the two rollup garage doors. Ross, still inside the garage, engaged Davis in negotiations. Ross mentioned multiple times that the officers were there to execute an eviction. Davis had the gun pointed directly at Ross, and Ross "thought [he] was getting shot that day." Davis stated, "[i]f I lower my gun, you're just going to take my resources away, my ID, my property . . . you're going to rush me and take me to jail."

Brown, still outside the garage door, looked around the pillar and saw Davis pointing the gun in his direction; he was also afraid of getting shot. Brown called for backup and Ross suggested Brown get a ballistic shield from their vehicle. Brown and Ross positioned themselves behind the shield. Eventually, in response to negotiations with Ross and the arrival of the Lynnwood Police Department, Davis put down his weapon and was arrested.

### Pre-trial

The State charged Davis with three counts of second degree assault—two of which included firearms enhancements—and one count of unlawful

---

[1] A shelf obstructed the inner door to the garage, so Brown went back outside for a clearer path to the garage.

possession of a firearm in the second degree. Davis pleaded not guilty.

Over the course of the next couple of months, Davis moved for new counsel multiple times. When requesting new counsel for the second time, Davis noted that "[b]oth attorneys out of the Public Defender office have proven to be inadequate in defending me . . . which is why I'm seeking conflict counsel." The court granted Davis's request for conflict counsel and Natalya Forbes was appointed. Less than a month later, Davis again requested new counsel. The court denied his motion and encouraged Davis to work with Forbes, to which he replied, "No."

Two weeks later, Forbes requested new counsel be appointed, citing "a complete breakdown in communication." The court denied this motion, noting that Davis's primary concern was the continued delay of trial and granting new counsel would only hold up proceedings further. Two months later, Forbes moved to withdraw. The court asked Davis, if granted new counsel, would he be able to communicate with them. Davis replied, "[a]s far as I'm concerned, you're all paid by the same beast. You're all against me, regardless of what you say." The court denied Forbes' motion, noting, essentially, that the problem was not the attorney, but Davis's unwillingness to work with representation.

A few weeks later, Davis requested to proceed pro se, noting that Forbes had not provided adequate or timely representation and he would be able to do a better job himself. The court questioned Davis on his experience and provided Davis with an explanation of what proceeding pro se would entail. The court warned Davis there are "significant disadvantages" to proceeding pro se, but at a

subsequent hearing, Davis unequivocally and voluntarily waived his right to counsel and declined the assistance of standby counsel.

Davis first raised the issue of his inability to access the law library at the same hearing he requested to proceed pro se. Despite asserting that he was having trouble accessing the law library at the prison and admitting that "every aspect of my ability to work on this case relies on me to go through the opposing party," Davis maintained that he did not want standby counsel.

During another hearing concerning motions in limine,[2] Davis again noted that he had not been granted access to the jail's law library. The court requested an order be prepared alerting the jail of Davis's decision to proceed pro se and his need for access to the law library. The court also requested that a representative from the jail appear at the next hearing to discuss Davis's access to the law library. Despite Davis asserting a lack of access to the law library, he was able to present motions at this hearing and confirmed he was not requesting a continuance.

At a hearing the following week, Davis again claimed he was not given adequate time at the law library, but continued to indicate he was not requesting a continuance. A representative from the jail noted that Davis had been scheduled for three, three-hour sessions[3] over the weekend but, because of his

---

[2] A motion in limine is "[a] pretrial request that certain inadmissible evidence not be referred to or offered at trial." BLACK'S LAW DICTIONARY, 1215 (12th ed. 2024).

[3] The jail representative noted that three, three-hour sessions a week is standard policy for the jail. The amount and timing of sessions in the law library is based on where the inmate is located, staffing, and the needs of other inmates.

own behavioral issues, Davis had only been allowed to utilize the library for one of the sessions. On Saturday, when a corrections officer woke Davis for his library time, Davis swore at the officer and said that he did not know he was scheduled for library time. The officer twice asked if he wanted his library time and Davis said he was not ready, kicked the door of his cell, and continued to yell at the officer. The officer took this as a refusal. On Monday, Davis's library time was denied after Davis yelled at a corrections officer and threw a bologna sandwich at the officer. The representative from the jail noted that "the jail has done everything that it needs to [do], to provide Mr. Davis with access to the law library, but it's really only his own actions that have prevented his ability to use the facility."

When asked how much additional time he would need to prepare, Davis told the court "[a] day or two at present." The court requested Davis be given additional time that week to prepare for trial, which the jail representative approved.[4] Davis was able to choose what days he wanted his sessions. Altogether, Davis claims he received less than eight hours in the law library to prepare.

At this same hearing, Davis sought to introduce evidence related to the ownership of the property he had been renting, including the Snohomish County Assessor's Report and certified proof of the deaths of Michael Dipofi and Tang, the alleged owners of the property. When questioned as to its relevance, Davis

---

[4] The court noted that the jail's procedure for granting time to pro se defendants was "problematic," but also recognized this was not an issue that could be resolved in the current matter.

6

stated it went to the credibility of the witnesses. The court then asked Davis if his overall defense was based on a claim of defense of property or self-defense, to which Davis responded that his "basis is denial." The court denied the motions because the documents were "impeachment on a collateral issue." The State nevertheless provided Davis with the Snohomish County Assessor's Report so Davis could have access.

Trial

At trial, Davis continued to assert that his inability to access the law library was the reason that he was not adequately prepared. When Davis sought to recall most of the State's witnesses for his case in chief, he argued that he had not been able to secure their appearance. The court noted that any matter Davis wished to address could have been brought up on cross-examination and Davis failed to do so. Additionally, when asked for an offer of proof about the testimony he sought to elicit from the witnesses, Davis indicated that he intended to impeach at least one of the witnesses. The court noted this was impeachment on a collateral issue and declined to allow it.

When it came time for closing arguments, Davis stated he did not have one prepared because he was unaware closing arguments would be happening that day. Opposing counsel noted that he had told Davis the prior day that closing arguments may happen. But after a short recess by the court, Davis did present a closing argument, and the court noted it was impressed by the argument.

Davis did not object to the jury instructions provided by the court. The court went out of its way to note that it did consider providing an instruction for defense of property, but ultimately declined to do so because "based upon the evidence presented, . . . I find that no reasonable juror can conclude that any trespass was malicious." Davis did not raise any issues with the judge's reasoning.

The jury convicted Davis on all counts. Davis appeals.

ANALYSIS

Self-Representation

Davis asserts that his lack of access to the jail's law library and standby counsel violated his constitutional right to self-representation. We conclude Davis's constitutional rights were not violated because he had reasonable access to the jail's law library and was offered and refused standby counsel.

We review questions of constitutional law de novo. *State v. Gregg*, 196 Wn.2d 473, 478, 474 P.3d 539 (2020).

Criminal defendants have a right to self-representation under both the Sixth Amendment to the United States Constitution and the Washington Constitution. U.S. CONST. amend VI; WASH. CONST. art 1, § 22; *see also State v. Madsen*, 168 Wn.2d 496, 503, 229 P.3d 714 (2010). For a defendant's self-representation to be meaningful, the defendant must be given reasonable access to legal materials "necessary to prepare an adequate pro se defense." *State v. Silva*, 107 Wn. App. 605, 613, 621, 27 P.3d 663 (2001). What constitutes reasonable and necessary "lie[s] within the sound discretion of the trial court after

8

consideration of all the circumstances, including . . . the fair allocation of judicial resources (i.e., an accused is not entitled to greater resources than [they] would otherwise receive if [they] were represented by appointed counsel), legitimate safety and security concerns, and the conduct of the accused." *Silva*, 107 Wn. App. at 622-23. Appropriate legal materials may include access to a law library, pencil and paper, access to a telephone, subpoenas, and witness interviews. *Silva*, 107 Wn. App. at 613, 625.

Appointment of standby counsel may also provide a defendant with the resources needed to effectuate meaningful self-representation. *State v. Dougherty*, 33 Wn. App. 466, 471, 655 P.2d 1187 (1982). Appointment of standby counsel against a pro se defendant's objections may be judicially authorized, but "to force a lawyer on a defendant can only lead [them] to believe that the law contrives against [them]." *Faretta v. California*, 422 U.S. 806, 834, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). A defendant's choice to represent themselves "must be honored." *Faretta,* 422 U.S. at 834. When a defendant chooses to proceed pro se, they are not entitled to "special consideration[,] and the inadequacy of the defense cannot provide a basis for a new trial or an appeal." *State v. DeWeese*, 117 Wn.2d 369, 379, 816 P.2d 1 (1991).

Here, Davis contends he was denied access to the jail's law library and, as a result, was unable to prepare a proper defense. But Davis was granted the standard amount of access to the law library per the jail's policies: three, three-hour sessions per week. The court asked Davis how much time he needed to prepare and worked with a jail representative to get him additional time in the

9

library.  Davis was never denied additional time in the law library when requested.  Davis's own behavior, including kicking his cell door and yelling at a corrections officer and throwing food at him, prevented him from fully utilizing his session time.  Despite continued complaints about not having access to the materials he needed, Davis repeatedly denied wanting a continuance.

Davis also asserts the court should have appointed him standby counsel over his objections to provide technical information.  But Davis vehemently denied standby counsel.  In response to Forbes' offer to stay on as standby counsel, Davis asserted he did not "want anything to do with Ms. Forbes whatsoever."  Additionally, when the court asked if Davis believed he could work with a new counsel, Davis responded, "The only person I could have more confidence in is a private attorney. . . . As far as I'm concerned, you're all paid by the same beast.  You're all against me, regardless of what I say."  Appointing standby counsel against Davis's wishes would have been fruitless, as Davis made it clear he believed he could provide a better defense working on his own.

Because any lack of access to the law library was Davis's own fault and he repeatedly, expressly declined standby counsel, his constitutional right to self-representation was not violated.

## Second Degree Assault

Davis contends there was insufficient evidence to determine beyond a reasonable doubt that he committed second degree assault against Deputy Brown.  We disagree.  Sufficient evidence exists to support Davis's second

degree assault conviction against Brown because Davis put Brown in apprehension of bodily harm and Brown feared for his life.

We review the sufficiency of evidence under the substantial evidence standard. *Dolan v. King County*, 172 Wn.2d 299, 310-11, 258 P.3d 20 (2011). To determine whether substantial evidence was presented, we must view the evidence in the "light most favorable to the state" and determine whether "any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). This standard of review is highly deferential to the jury's decision. *In re Pers. Restraint of Arnsten*, 2 Wn.3d 716, 724, 543 P.3d 821 (2024).

To prove assault in the second degree, the State must show the defendant intentionally assaulted another with a deadly weapon. RCW 9A.36.021(1)(c). Washington courts have recognized three definitions of "assault": "(1) an unlawful touching (actual battery); (2) an attempt with unlawful force to inflict bodily injury upon another, tending but failing to accomplish it (attempted battery); and (3) putting another in apprehension of harm." *State v. Elmi*, 166 Wn.2d 209, 215, 207 P.3d 439 (2009).[5]

Here, the State presented evidence to show that the defendant committed assault in the second degree against Brown under two theories: intended-victim theory and transferred-intent theory.

---

[5] Count 3 (Brown's assault) was predicated on the apprehension definition.

11

1.  <u>Intended-Victim Theory</u>

Under the intended-victim theory, the State must prove that the defendant "inten[ded] to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury."

Specific intent can be inferred when a defendant points a gun at another, unless the victim knows the gun is unloaded.  *State v. Miller*, 71 Wn.2d 143, 146, 426 P.2d 986 (1967).  Even when a gun is not pointed directly at the victim but is being wielded in a way that causes apprehension and fear of injury, second degree assault can occur.  *Arnsten*, 2 Wn.3d at 730 (affirming a second degree assault charge where, even though the defendant did not point his gun at the victim, he took the gun out "to create fear and apprehension that he would harm [the victim]").  No physical injury is needed for a finding of second degree assault.  *Arnsten*, 2 Wn.3d at 725.

In his testimony, Brown stated that Davis's gun was pointed in his direction and he was afraid of getting shot.  Brown stated when he was standing behind the pillar of the garage, he did not feel safe.  He testified that "a bullet could easily go through it."  Even after Brown brought the ballistic shield out, he noted that he didn't feel less afraid.  The shield was not large enough to cover a

single person, let alone both Brown and Ross. A picture of the shield is included below.[6]



Brown was reasonably apprehensive and feared imminent bodily injury as a result of Davis's actions. Sufficient evidence exists to find assault in the second degree against Brown under an intended-victim theory.

2. Transferred-Intent Theory

The doctrine of transferred intent provides that "once the intent to inflict harm on one victim is established, the mens rea transfers to any other victim who is actually assaulted." *State v. Aguilar*, 176 Wn. App. 264, 275, 308 P.3d 778 (2013). When challenging the sufficiency of the evidence for a finding of

---

[6] This image was admitted as Exhibit 44 at trial.

transferred intent, the court must view the evidence in light of the instructions given to the jury. *State v. Jussila*, 197 Wn. App 908, 921, 392 P.3d 1108 (2017).

Here, the jury instruction provided: "If a person acts with intent to assault another, but the act harms a third person, the actor is also deemed to have acted with intent to assault the third person." Under these instructions, if the jury found Davis intended to assault both Fournier and Ross, that intent would transfer to Brown given his apprehension and fear of immediate bodily harm. Davis did not challenge the findings that he intended to assault Fournier and Ross; therefore, the jury had sufficient evidence to find the necessary mens rea as to Brown under the instructions given.

We conclude sufficient evidence exists to support an intended-victim and transferred-intent theory of second-degree assault against Brown.

### Presentation of Defense

Davis asserts the trial court violated his constitutional right to present a defense by excluding evidence critical to his defense and by not instructing the jury on the theory of defense of property. We disagree.

We review whether the Sixth Amendment right to present a defense has been violated de novo. *State v. Arndt*, 194 Wn.2d 784, 797, 453 P.3d 696 (2019); *see also State v. Walker*, 136 Wn.2d 767, 772, 966 P.2d 883 (1998) ("The trial court's refusal to give an instruction based upon a ruling of law is reviewed de novo."). But we review a trial court's evidentiary rulings for an abuse of discretion. *Arndt*, 194 Wn.2d at 797.

A criminal defendant's right to present a defense is guaranteed by both the United States Constitution and the Washington State Constitution. U.S. CONST. amend VI; WASH. CONST. art 1, § 22. To determine whether a defendant's right to present a defense has been violated, Washington courts engage in a two-step review process. *Arndt*, 194 Wn.2d at 797-98. First, the court reviews the trial court's evidentiary rulings for abuse of discretion. *State v. Jennings*, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022). If the evidentiary ruling was not an abuse of discretion, the court then considers "whether the exclusion of evidence violated the defendant's constitutional right to present a defense." *Jennings*, 199 Wn.2d at 58.

In assessing a challenge to a trial court's evidentiary ruling, the court determines if the evidence is at least minimally relevant. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). Defendants do not have a constitutional right to present irrelevant evidence. *Jones*, 168 Wn.2d at 720. If evidence is relevant, the court "must weigh the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence to determine if excluding the evidence violates the defendant's constitutional rights." *Jennings*, 199 Wn.2d at 63.

The use of force in defense of property is not unlawful "[w]henever used by a party about to be injured . . . in preventing or attempting to prevent an offense against his or her person, or a malicious trespass, or other malicious interference with real or personal property lawfully in his or her possession, in case the force is not more than is necessary." RCW 9A.16.020(3). Whether the

15

use of force in defense of property is greater than justified is ordinarily a question of fact for the jury. *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wn.2d 485, 506, 125 P.2d 681 (1942). But the amount of force used has its limitations and can be so disproportionate to be unjustified as a matter of law. *See, e.g.*, *State v. Murphy*, 7 Wn. App. 505, 515, 500 P.2d 1276 (1972) (holding that the use of a deadly weapon in ejecting nonviolent trespassers was not justified as a matter of law).

Here, Davis maintains the court abused its discretion when it rejected a claim of defense of property and denied the admission of evidence to mount that defense. Davis claims his actions were lawful because he was "defending his property from what he believed to be an unlawful eviction," and he was entitled to present "some evidence" showing the basis for his belief that the police were maliciously interfering with his property. Upon Davis's request, the court admitted evidence of Davis's lease, the 14-day eviction notice, and the writ of restitution packet. Davis does not specify what evidence the court erroneously denied. Regardless, any evidence supporting a defense of property theory is not relevant because a defense of property theory was not viable.

Similar to *Murphy*, 7 Wn. App. at 515, where the defendant used a firearm in an attempt to eject officers who were not trespassing, Davis's use of force was unjustified. Here, the officers were performing a lawful eviction. Whether Davis believed the officers were trespassing or not (i.e., whether he was in lawful possession of the property), his use of force was greater than necessary and unjustified under the circumstances. Because defense of property is not a valid

16

justification, the court properly excluded that instruction from the jury instructions. Accordingly, any evidence supporting a theory of defense of property was also properly excluded, and Davis's constitutional right to present a defense was not violated.

Prosecutorial Misconduct

Davis asserts the State committed prosecutorial misconduct by using admitted exhibits on separate, consecutive slides in its closing argument. We disagree.

This court reviews prosecutorial misconduct allegations for abuse of discretion. *State v. Brown*, 132 Wn.2d 529, 563, 940 P.2d 546 (1997). Abuse of discretion arises when "the trial court 'acts on untenable grounds or its ruling is manifestly unreasonable.' " *State v. Hill*, 19 Wn. App. 2d 333, 345, 495 P.3d 282 (2021) (quoting *State v. Gaines*, 194 Wn. App. 892, 896, 380 P.3d 540 (2016)).

To prevail on a claim of prosecutorial misconduct, a defendant must establish "in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 678, 286 P.3d 673 (2012). Prejudice is established "only where 'there is a substantial likelihood the instances of misconduct affected the jury's verdict.' " *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003) (quoting *State v. Pirtle*, 127 Wn.2d 628, 627, 904 P.2d 245 (1995)). Prosecuting attorneys are permitted wide latitude in their closing arguments to " 'draw[] and express[] reasonable inferences from the evidence.' " *Brown*, 132 Wn.2d at 565 (quoting *State v. Gentry*, 125 Wn.2d 570, 461, 888 P.2d 1105 (1995)). When a

defendant fails to object to improper conduct during trial, it constitutes a waiver unless the defendant can establish the "misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice." *Glasmann*, 174 Wn.2d at 704.

A prosecutor commits flagrant misconduct when they deliberately alter evidence in a way that influences the jury's deliberations. *Glasmann*, 175 Wn.2d at 706-07. Presenting numerous, suggestive photos with superimposed captions in a PowerPoint slideshow constitutes flagrant misconduct. *Glasmann*, 175 Wn.2d at 706-07; *see also State v. Walker*, 182 Wn.2d 463, 477-78, 341 P.3d 976 (2015) (holding that the prosecutor's PowerPoint presentation was "serious misconduct" because it contained over 100 slides that included inflammatory captions, racial text, and expressed personal opinions of the defendant's guilt). Showing an unkempt and bloodied booking photo may also be misconduct. *Glasmann*, 175 Wn.2d at 705. But, while a booking photograph may not be "absolutely necessary," its relevance in establishing identity in a prior conviction is not prejudicial. *State v. Newton*, 42 Wn. App. 718, 726-27, 714 P.2d 684 (1986). In addition to altered and/or prejudicial images, prosecutorial misconduct may occur where photographs of the victim and defendant are shown together on a single slide and are meant to improperly compare the two parties. *State v. Salas*, 1 Wn. App. 2d 931, 944-45, 408 P.3d 383 (2018) ("[S]lide shows may not be used to inflame passion and prejudice.").

Because Davis failed to object to the State's slides at trial, Davis must show that the State's behavior was so flagrant or ill-intentioned it could not have

been cured by an instruction to the jury. Davis takes issue with three sets of slides: slides 33-35 (depicting photographs of the officers on the day of the eviction taken from a surveillance camera); slides 47-48[7] (slide 47 is Davis's mugshot and slide 48 includes two pictures of the weapon Davis used); and slides 59-60 (slide 59 is Davis's booking photo from a previous arrest and a photo of Davis's identification and slide 60 is the jury instructions for "armed with a firearm").

Davis's specific objection to slides 33-34 is unclear. Davis states that the slides "depict[] three officers carefree and unarmed," but provides no rationale for why these images would constitute misconduct. Even assuming Davis meant to argue these images were prejudicial in a manner similar to the *Salas* case, that argument is unconvincing. Unlike *Salas*, the pictures here were not put on the same slide as Davis's photo and were not used to "inflame passion and prejudice." *Salas*, 1 Wn. App. 2d at 944-45. Furthermore, unlike *Salas*, none of the slides contained inflammatory text or altered exhibits. The images on slides 47-48 also fail to contain elements of flagrant misconduct. The sequence of Davis's booking photo and a picture of the weapon tracked with the elements the State was required to prove.

Finally, Davis had the opportunity to stipulate to his prior conviction, which would have alleviated the need for the State to present the images in slides 59-60. These images were used by the State to establish the prior conviction element of Davis's fourth charge of unlawful possession of a firearm in the

---

[7] Davis misidentifies these slides as 44 and 45 in his brief.

second degree. Any possible prejudice that did exist could have been cured by an instruction to not consider the defendant's past incarceration status in deciding its verdict except for the purposes of determining whether Davis had been previously convicted of the predicate offense. The State's use of the closing PowerPoint slides was not improper and, therefore, no misconduct occurred that was flagrant or ill-intentioned.

<u>Exceptional Sentencing</u>

Davis contends the court erred when it stated it lacked the authority to not impose firearm enhancements consecutively under RCW 9.94A.533(3)(e). We disagree because the trial court did not have authority to impose an exceptional sentence under RCW 9.94A.533(3)(e).

We review the interpretation of a statute de novo. *State v. Abdi-Issa*, 199 Wn.2d 163, 168, 504 P.3d 223 (2022).

Under RCW 9.94A.535, "[t]he court may impose a sentence outside the standard sentence range for an offense if it finds, considering the purpose of this chapter, that there are substantial and compelling reasons justifying an exceptional sentence." But the enhancement statute RCW 9.94A.533(3)(e) provides in pertinent part: "[n]otwithstanding any other provision of law, all firearm enhancements under this section are mandatory, shall be served in total confinement, and shall run consecutively to all other sentencing provisions, including other firearm or deadly weapon enhancements, for all offenses sentenced under this chapter. In *State v. Brown*, 139 Wn.2d 20, 29, 983 P.2d

608 (1999), the Supreme Court held "judicial discretion to impose an exceptional sentence does not extend to a deadly weapon enhancement."

Davis maintains that precedent has changed since *Brown*, and the language of RCW 9.94A.533(3)(e) allows for modification of firearm enhancements. Davis is correct that precedent has changed since *Brown*, but he mischaracterizes the extent to which firearm enhancements may be modified. Subsequent case law overruled *Brown*, but only as applied to juveniles; *Brown* is still good law with regards to all other individuals (such as Davis). Washington courts have repeatedly confirmed *Brown* was overruled only to juveniles. *State v. Kelly*, 25 Wn. App. 2d 879, 889, 526 P.3d 39, *granting review*, 2 Wn.3d 1032 (2023) (noting that *Brown* was overruled "with regard to juveniles only"); *State v. Wright*, 19 Wn. App. 2d 37, 47, 493 P.3d 1220 (2021) ("It is settled law that except in the case of juveniles, firearm enhancements cannot run concurrently as an exceptional sentence.").

We conclude that the trial court did not err when it stated it did not have authority to impose an exceptional sentence under RCW 9.94A.533(3)(e).

## Victim Penalty Assessment

Davis and the State agree the court should strike the VPA from Davis's conviction.

Interpretation of a statute is reviewed de novo. *Abdi-Issa*, 199 Wn.2d at 168. Under former RCW 7.68.035 (2018), a trial court was required to impose a $500 VPA on any person convicted of a crime. In 2023, the legislature amended the statute, prohibiting imposition of the VPA on indigent defendants as

defined in RCW 10.01.160(3).  This amendment took effect on July 1, 2023.

LAWS OF 2023, ch. 449, § 1.  A defendant, on direct appeal not yet final, is entitled

to remand to receive the benefits of the recent legislative amendments.  *State v.*

*Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023).  The trial court found Davis

indigent under RCW 10.01.160(3), yet still imposed the $500 VPA.  Given the

updated statute, the VPA should be stricken from Davis's judgment and

sentence.

We affirm the defendant's conviction and sentence but remand to strike

the victim penalty assessment.

_____
Smith, C.J.

WE CONCUR:

_____     _____
Birk, J.                      Chung, J.